POSNER, Circuit Judge.
This is a suit under the Americans with Disabilities Act, which so far as pertains to this case forbids an employer to discriminate against “a qualified individual,” 42 U.S.C. § 12112(a), defined as “an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.” § 12111(8). The plaintiff began working as one of two hairdressers (also doing manicures) at Mason Point in 1981. Mason Point is a large nursing home located in the countryside outside the town of Sullivan, in south-central Illinois. Mondays and Tuesdays the plaintiff would wheel residents one by one in their wheelchairs from their rooms to the nursing home’s beauty shop, do their hair, then wheel them back to their rooms. On the other days of her four-day workweek she mainly did the hair of residents who could get to the beauty parlor under their own steam and of residents confined to their rooms, so on those days she rarely had to push wheelchairs. She had some duties that were unrelated both to hairdressing and wheelchairs, such as cleaning out the birdcages in the nursing home, helping out in the laundry, and carrying breakfast trays to residents.
The focus of concern in this litigation is her wheeling duties. The residents whom she wheeled ranged in weight from 75 to 400 pounds; she estimated their average weight at 120 pounds. A lot of wheeling is involved, because as shown in the aerial map below the nursing home consists of several scattered buildings. Although the beauty parlor (BLD 3 in the diagram) is centrally located, it is about 500 feet from the farthest residential building (BLD 13). ■ The plaintiff estimated that it usually took her no more than two or two and a half *960 minutes to wheel a resident to the beauty parlor even from that building. But probably it took longer. For she said that on her journeys to and from the beauty parlor residents would often stop to talk to her or her passenger. And some of the corridors in the nursing home have ramps, which the wheelchairs must traverse. The other hairdresser confirmed the plaintiffs time estimate, but probably meant that two to two and a half minutes was the average time to wheel a resident from the resident’s room to the beauty parlor, rather than the time required for the farthest journey.
[[Image here]]
In late December 2010 the plaintiff had a hysterectomy because of what is called uterine prolapse cystocele (cystocele is also called prolapsed bladder): her uterus had slipped out of its normal position and in doing so had dislodged her bladder. As part of the operation to remove the uterus, the bladder was reconstructed and a mesh lining installed in her abdomen to hold the bladder in place.
Her doctor gave her written permission to return to work eight weeks after the operation, but with the notation that she could not “push over 20 pounds until released to do so,” a limit raised by the doctor to 50 pounds five months later. But he didn’t know that her job involved pushing wheelchairs; he thought her just a hairdresser. When later she mentioned her wheelchair duties to him, he told her “you can’t be pushing and lifting” people in wheelchairs, because “over a repetitive time” that would cause her mesh lining to be torn loose “and you’ll be back in for bladder repair again.” Although at the oral argument the plaintiffs lawyer told us that the weight restriction was later removed and that her client can now push wheelchairs again (though she is not doing so), these representations are belied by the plaintiffs testimony about her doctor’s warning her not to push wheelchairs any more, at least occupied wheelchairs. Piling on the confusion, eventually the doctor informed her that the restrictions had been lifted, yet in the next sentence of the *961 same letter (actually a letter addressed “to whom it may concern re: Debra Kauff-man” — the intended recipient doubtless being her then employer, Mason Point, though she received a copy) warned that if she did heavy lifting (presumably including pushing a wheelchair with- a person in it), she might again experience a prolapsed bladder. For what it’s worth we note that most doctors recommend not lifting more than 50 pounds ever after the type of surgery she had. ReedGroup, “Disability Guidelines: Cystocele or Rectoeele,” www. mdguidelines.com/cystocele-or-rectocele (visited Sept. 25, 2014, as were the other websites cited in this opinion).
We don’t understand the defendant to be denying that the consequences of the plaintiffs prolapsed bladder constituted a disability within the meaning of the Americans with Disabilities Act: “a physical or mental impairment that substantially limits one or more major life activities of such individual.” 42 U.S.C. § 12102(1)(A); see also § 12102(2). A prolapsed bladder impairs not only ability to lift and push but also vaginal and bladder functions. See ReedGroup, supra.
On the basis of the doctor’s warning, the plaintiff advised the nursing home’s administrator, Darin Wall, that she could not push residents 'in wheelchairs any more. She testified at her deposition that he responded that “we just don’t allow people to work with restrictions, and you have a restriction on here.... [A]s long as you’ve got the restriction we can’t employ you.” She asked him whether someone else might push the residents to and from the beauty parlor for her, but he demurred. He testified at his deposition that “we were not able to accommodate that. It would put a hardship on the facility to hire somebody to transport the patients from the beauty shop to the resident’s room and back and forth. That was something that we were not able to do.”
After Wall made clear that he would not accommodate her disability, she quit. Until she was replaced, the remaining hairdresser received assistance from other staff in wheeling the residents to and from the beauty parlor. There is no suggestion that this diversion of staff from their normal duties was costly to the nursing home or impaired the care provided the residents.
In granting summary judgment in favor of the nursing home, the district judge ruled that wheeling patients to and from the beauty parlor is an essential part of the hairdressers’ job and therefore there was no reasonable accommodation to the plaintiffs disability that would enable her to meet the employer’s reasonable expectations. Unresolved factual disputes vitiate the judge’s analysis. While Wall estimated that wheeling residents occupied 60 to 65 percent of the plaintiffs workday, she estimated that it occupied only 6 percent of her time on Mondays, when she would usually have only 4 to 6 residents whom she had to wheel, and 12 percent on Tuesdays, when she had 10 or 11 residents to wheel, and insignificant time the other two days of her work week. She worked a 35-hour week, but she front-loaded her hours so that she worked 9.5 hours on Mondays and on Tuesdays, or 19 hours for the two days. Nine percent ((6% + 12%) -e 2) of 19 hours is 1.71 hours. The question would then be whether her inability to wheel could reasonably be accommodated by assistance from other staff, as seems to have worked for the other hairdresser after the plaintiff left the nursing home until a replacement was hired.
Staff time at the nursing home is approximately 8 hours a day per resident. The Nursing Home Site, “Mason Point in Sullivan, II.,” www.nursinghomesite.com/ *962 mason_point_sull ivan_il# MA-SONJPOINT_Staff_Size. As there are about 100 residents, 3 hours of staff time per resident equates to a total of 300 hours of staff time a day, or 600 on Monday plus Tuesday. Fewer than two hours of pushing wheelchairs for a hairdresser on Monday and Tuesday would thus require less than one-third of one percent (2 ^ 600 = .0033) of the available staff time on those two days. One would think it possible without disrupting the operation of the nursing home to assign one member of the staff to push wheelchairs for the plaintiff on Mondays and another to do the same on Tuesdays. Of course this is on the assumption that the plaintiffs estimate of the time she spent wheeling wheelchairs (fewer than two hours a week) is at least approximately correct, and it may not be. But it is more realistic than administrator Wall’s estimate, which has the plaintiff spending almost two-thirds of her entire workweek pushing wheelchairs back and forth. Wall was thus way off base in saying (what he was actually thinking when he was speaking is another matter) that continuing to employ her would have required hiring an additional employee to wheel for her. (What is true, though mentioned by neither party, is that an orderly who wheeled for her would require a few minutes to walk to the resident’s room to begin the wheeling and to walk to the beauty parlor to start wheeling the resident back to her room.)
What the best estimate of the plaintiffs time spent wheeling is can’t be determined on a motion for summary judgment. A trial is required. The district judge thought the disparity in time estimates was not a real dispute because, however much or little time the plaintiff had spent before her operation in pushing wheelchairs, it was an essential part of her job. But it wasn’t essential if it was so small a part that it could be reassigned to other employees at a negligible cost to the employer.
The district judge also thought the plaintiffs estimate of the time she had spent pushing wheelchairs “vague and inconclusive,” yet he said nothing about the implausibility of Wall’s estimate of how much time the plaintiff had devoted to that task. Again the judge was attempting to resolve a genuine factual dispute without a trial.
A further problem with the judge’s handling of this case concerns a dispute over the nursing home’s policy toward employees who have a disability. When the plaintiff showed Wall her doctor’s note that forbade her to “push over 20 pounds until released to do so,” neither she nor he knew she would never be “released” to resume her wheelchair-pushing duties. She says that Wall told her “we don’t allow people with restrictions to work.” That would be a violation of the Act. He testified at his deposition that he told her “with permanent restrictions.” The judge accepted his testimony, again apparently forgetting that resolving a testimonial contradiction between depositions requires a trial.
More important, it’s not true that the fact that a restriction is permanent automatically excuses the employer from making any attempt to accommodate it. Otherwise an amputee would never have a right to an accommodation, even if it involved nothing more costly to the employer than lowering the sink in the employees’ bathroom. Indeed Wall’s acknowledgment that Mason Point will not retain an employee who has a permanent restriction (a policy sometimes referred to as “100% healed”) would if accepted as a defense read “reasonable accommodation” out of the Americans with Disabilities Act. Powers v. USF Holland, Inc., 667 F.3d 815, *963 819 (7th Cir.2011); Henderson v. Ardco, Inc., 247 F.3d 645, 653 (6th Cir.2001). “Job restructuring” is one of the accommodations that an employer must consider. See EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act: “Job Restructuring,” www. eeoc.gov/policy/docs/accommodation.ht ml# job. If a minor adjustment in the work duties of a couple of other employees would have enabled the plaintiff despite her disability to perform the essential duties of her job as a hairdresser, the nursing home’s refusal to consider making such an adjustment was unlawful. We noted in Majors v. General Electric Co., 714 F.3d 527, 534 (7th Cir.2013), citing Miller v. Illinois Dept. of Transportation, 643 F.3d 190, 199-200 (7th Cir.2011), that “circumstances might exist when employees working in teams are able to share duties among themselves, so that such sharing might be a form of reasonable accommodation.” So minor an adjustment would be “reasonable.”
If an accommodation to an employee’s disability is reasonable, the burden shifts to the employer to “demonstrate that the accommodation would impose an undue hardship on the operation of the [employer’s] business.” 42 U.S.C. § 12112(b)(5)(A). Mason Point has made no such demonstration. Wall cited “hardship” only in reference to hiring a new employee whose only job would be to wheel residents whose hair was done by the plaintiff to the beauty shop and back. He did not mention the possibility of diverting some time of existing employees to that wheeling. There is no suggestion that the terms of a collective bargaining agreement (if there is one, of which there’s no evidence), or anything else, would have made the slight adjustment (necessary to preserve the plaintiffs job) of the work routines of a few members of the nursing home’s staff costly or impracticable. There is only Wall’s assertion that he doesn’t employ people with permanent work restrictions, regardless of the gravity of the restrictions or the feasibility and cost of accommodating them.
A further problem with the district judge’s decision is his ignoring the requirement that when an employee asks for an accommodation because of a disability, “the employer must engage with the employee in an ‘interactive process’ to determine the appropriate accommodation under the circumstances.” Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 563 (7th Cir.1996); ,see also 29 C.F.R. § 1630.2(o )(3); Basden v. Professional Transportation, Inc., 714 F.3d 1034, 1038-39 (7th Cir.2013); Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1112-16 (9th Cir.2000) (en banc), vacated on other grounds, 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002). Wall didn’t do that. He did tell the plaintiff that he’d check with his superiors about accommodating her and get back to her after he did-but when he did get back to her all he said was that he couldn’t accommodate her disability. This left her with no alternative to quitting. He should have asked her how much of her time at work is spent pushing wheelchairs, and on the basis of her answer and relevant information from other employees, such as the other hairdresser, have decided whether her disability could be accommodated without undue hardship to the nursing home. Had he discovered that only a few hours a week were involved, he would have known better than to tell her that he’d have to hire a new employee just to push wheelchairs for her.
And remember that she had other duties besides pushing wheelchairs and doing residents’ hair. She raised the possibility of switching from hairdressing to full-time *964 work in the laundry, but Wall brushed off the suggestion, so far as appears with no consideration of its feasibility. He did not indicate, by the way, that the nursing home has ever attempted to accommodate an employee (the staff numbers over 40, we were told at the oral argument) who has a disability.
And speaking of those 40 employees, we imagine that some of them are orderlies whose primary duty is wheeling the residents. For almost three-quarters of the residents are wheelchair-bound, and most of them surely don’t want to spend all day in their room. And beauty parlor visits are only once a week. Should a trial reveal that the only accommodation needed to enable the plaintiff to remain employed by the nursing home would have been a couple of hours of orderly time a week, Wall might have a very hard time proving that such an accommodation would be a “hardship” to the nursing home.
The grant of summary judgment in favor of the defendant is reversed and the case remanded for further proceedings consistent with this opinion.
Reversed AND Remanded.