In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2400

MICHAEL STERN,

*Plaintiff-Appellant,*

*v.*

ST. ANTHONY'S HEALTH CENTER,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:12-cv-00785-SCW — **Stephen C. Williams**, *Magistrate Judge.*

ARGUED OCTOBER 30, 2014 — DECIDED JUNE 4, 2015

Before WILLIAMS, TINDER, and HAMILTON, *Circuit Judges.*

TINDER, *Circuit Judge.* St. Anthony's Health Center ("SAHC") fired Michael Stern after a neutral evaluator opined that Dr. Stern's short-term memory deficiencies rendered him unfit for duty as SAHC's Chief Psychologist. Dr. Stern sued under the Americans with Disabilities Act ("ADA"), and the district court granted summary judgment to SAHC. Dr. Stern appeals, contending, *inter alia*, that SAHC failed to engage with him in an interactive process to

find reasonable accommodations that would permit him to continue his employment. We are troubled by SAHC's actions, which short-circuited the interactive process mandated by the ADA. But because Dr. Stern failed to create an issue of fact as to whether he was able to perform the essential functions of his job with or without reasonable accommodation, we affirm.

## I.     BACKGROUND

In 1998 Dr. Stern began working as a clinical psychologist in SAHC's Psychological Services Department, an acute-care facility offering inpatient and outpatient psychological services in Alton, Illinois. Four years later, SAHC promoted Dr. Stern to Chief Psychologist, a position he held until he was fired in 2010. As Chief Psychologist, Dr. Stern's position was divided into three broad areas of responsibility: supervisory, administrative, and clinical. Dr. Stern was solely responsible for supervising the Department's six clinical professionals, one Ph.D.-credentialed psychologist and five licensed counselors. Supervision of the clinical staff consumed approximately 30%-50% of Dr. Stern's professional time. Dr. Stern performed administrative tasks, such as billing, scheduling, payroll, planning, budgeting, managing, evaluating, organizing, and developing the Department, which occupied approximately 15%-30% of his professional time. Finally, Dr. Stern provided direct clinical treatment to patients, which consumed approximately 15%-25% of Dr. Stern's professional time. Dr. Stern's patients, over 60% of whom were children, presented with psychological and mental problems including depression, anxiety disorders, and suicidal risks. Complex cases, that is, ones which required more intensive psycho-therapeutic work, dominated his patient load.

On March 29, 2010, Dr. Stern received an annual perfor-
mance evaluation for 2009 signed by Patti Fischer, SAHC's
Vice President of Physician Services and Dr. Stern's direct
supervisor. Fischer assigned Dr. Stern an overall score of
2.54 on a scale of 0-4, which resulted in Dr. Stern receiving a
2.5% merit pay increase. Fischer said that Dr. Stern's
strengths during 2009 were that he had "developed a great
team, embraced productivity, [g]reat volumes!" and his
"growth opportunities" were: "Fix billing! Continue to im-
prove financial skills."

In July 2010, one of Dr. Stern's subordinates, Tracy
Sashidharan, resigned and made troubling comments about
Dr. Stern during her exit interview with a human resources
manager. Sashidharan reported that she was leaving SAHC
because of significant concerns about Dr. Stern and indicated
that others in the Department were also considering leaving.
She said Dr. Stern had "cognitive issues," such as forgetting
appointments and meetings, forgetting to get pre-approval
for services, failing to perform timely performance reviews,
exhibiting impulsive behavior, and "passing off administra-
tive work." Sashidharan "personally observed that [patient]
charts prepared by Dr. Stern failed to include … basic infor-
mation," such as dates of services, treatment plans, treat-
ment goals, and whether the goals were being met.
Sashidharan said Dr. Stern took six to twelve months instead
of the required two weeks to furnish reports to local school
districts confirming or denying "whether a suspended stu-
dent was fit to safely return to school after an incident."
Sashidharan opined that Dr. Stern was suffering from Alz-
heimer's disease, and although she had told him of her con-
cerns, she "[did]n't think he remember[ed] the conversa-
tion." She "believed Dr. Stern's condition had become a sig-

nificant problem and risked the quality and integrity of patient care." She notified her coworkers in advance of what she would say during her exit interview, and it was her impression that they supported her decision because, although they "were fond of Dr. Stern, [they] had the same concerns."

The human resources manager relayed Sashidharan's comments to Fischer, Dr. Stern's supervisor. Fischer spoke with Sashidharan, who reiterated her concerns. Sashidharan told Fischer that Dr. Stern's memory seemed to have gotten progressively worse over the previous year and a half. She said she contemplated reporting Dr. Stern to the Illinois Department of Professional Regulations, the licensure and disciplinary agency responsible for psychologists. She said there had been patient complaints about Dr. Stern "not following up." She said two other subordinates of Dr. Stern had spoken with him about his memory and cognitive functioning, but he "kind of laughed it off and [one employee] wasn't certain that he even remembered it the next day."

Fischer next spoke with Shannon Baugher, Dr. Stern's subordinate and the Department's only other Ph.D.-level psychologist. Dr. Baugher said that "she was very concerned about [Dr. Stern's] cognitive functioning and that it had been progressively going downhill very gradually over the last year and a half, and that it was something that they didn't realize had gotten so bad because it was so gradual, and [the other members of the Department] had gradually taken on more and more of his responsibilities." Dr. Baugher echoed Sashidharan's comment about patient complaints, and gave other examples, including that "she must have showed him at least three or four times just how to forward an e-mail, he couldn't remember where the button was on Microsoft Out-

look that you would hit to forward an e-mail to someone
else, and each time she showed him he acted like it was the
first time." Dr. Baugher said she was concerned about
whether Dr. Stern "could safely treat patients" given "his
memory deficiencies."

Fischer also spoke with Susanne Ringhausen, who
shared an office suite with Dr. Stern's Department, and was
SAHC's Director of the Employee Assistance Program and a
licensed clinical counselor. Ringhausen expressed concerns
about Dr. Stern's memory deficiencies and opined that "he
had signs of early cognitive or dementia problems, such as
irritability and forgetfulness." Ringhausen relayed to Fischer
that Dr. Stern had whispered in Sashidharan's ear, "I love
you," which Ringhausen ascribed to "possible dementia."[1]
Ringhausen said she spoke with Dr. Stern about her con-
cerns "as a colleague," but he "denied the validity of these
concerns and minimized the severity of the concerns and
complaints."

Fischer also had concerns based upon her own experi-
ences with Dr. Stern. Between approximately April or May
2010 and July 2010, Fischer felt that Dr. Stern had repeatedly

---

[1] Sashidharan did not mention this incident to Fischer. During litigation,
Sashidharan submitted affidavits on behalf of both Dr. Stern and SAHC.
In Dr. Stern's affidavit, Sashidharan said that Dr. Stern served as a pro-
fessional mentor to her and "was consistently kind to [her] and consist-
ently treated [her] with respect and professionalism." She said that, on at
least one occasion, Dr. Stern said "I love you" to her, "but this was said
in a 'fatherly' or 'grandfatherly' affectionate fashion; [she] was not of-
fended by it." In SAHC's affidavit, Sashidharan said she "observed Dr.
Stern engage in behavior that [she] considered impulsive, unprofessional
and sexually charged," and gave two examples other than the "I love
you" incident.

forgotten their prior discussions on the subject of hiring a new child psychologist. On a more personal level, Fischer felt that Dr. Stern had recently mishandled the treatment of Fischer's minor relative, who had been treated by Dr. Stern "on and off" since 2005. In April 2010, the child asked to see Dr. Stern; after this session, Dr. Stern said he was concerned about her, and recommended anti-depressant medication and a quick follow-up visit. However, after a session on May 10, 2010, Dr. Stern reported that the child was "a lot better" and "she didn't need to follow up for maybe a couple of months." (For Fischer's part, she believed that the child was "on again and off again," but by May the child "was certainly better than she had been.") In late June 2010, the family discovered that the child had been cutting herself for "probably more than a year." Thereafter, Fischer "didn't feel comfortable with [the minor] going back to Dr. Stern" because he "felt … she could go unmonitored for at least a couple of months" and "he had no idea she had been cutting," so Fischer transferred the minor's care to a different SAHC counselor.

In August 2010, after the discussions recounted above, Fischer consulted Lawrence Burch, an internist and SAHC's Vice-President of Medical Affairs. Dr. Burch advised that SAHC "should get an evaluation because no one [at SAHC], including [him]self, was really capable of making a full evaluation of the problem, but if that problem did exist it was absolutely necessary that it be elucidated." Fischer then spoke with a case manager at the Illinois Health Professional's Program, who also recommended that SAHC have Plaintiff evaluated and furnished recommendations of clinics that were experienced in evaluating medical professionals.

On August 18, 2010, Fischer and Dr. Burch met with Dr. Stern and informed him of the reported concerns about his cognitive functioning. Fischer told Dr. Stern that SAHC was requiring him to undergo a fitness-for-duty evaluation at SAHC's expense, and she gave him information regarding the clinics recommended by the Illinois Health Professional's Program. Fischer told Dr. Stern that he would be placed on a paid "leave of absence effective immediately and he would remain on leave until [SAHC] had the results of the evaluation which indicated that he was fit for duty."

Dr. Stern later contacted Fischer and said he "wasn't impressed" with the recommended clinics, and he requested that SAHC retain Robert Fucetola, Chief of Clinical Neuropsychology at Washington University Medical School, to conduct the evaluation. Dr. Stern believed Dr. Fucetola would provide "the best possible evaluation and [was] the most credentialed person [he] could get." Fischer agreed to Dr. Stern being evaluated by Dr. Fucetola at SAHC's expense.

Fischer contacted Dr. Fucetola and retained him to "do the assessment and give [SAHC] a fitness for duty [opinion]." After two days of cognitive testing and interviews with Dr. Stern and his wife, Dr. Fucetola issued a "draft report" which did not "clearly say yes or no [whether Dr. Stern] was fit for duty." Fischer telephoned Dr. Fucetola and "reminded him that he had told [Fischer] he would give [her] a definitive fitness for duty [opinion], yes or no." During this conversation, Dr. Fucetola told Fischer that Dr. Stern "definitively had cognitive issues in terms of word retrieval and memory," and said "he would typically see symptoms like this in early Alzheimer's patients, but you couldn't be …

sure unless you did longitudinal testing." Dr. Fucetola then issued his final report.[2]

In his final report, Dr. Fucetola wrote: "The current evaluation indicates that there are short-term memory deficiencies in Dr. Stern, with a level of memory functioning that is below expectation considering his age, education, and high intellectual potential." The report indicated that Dr. Stern's "higher level working memory" and "general cognitive functioning" were "mildly deficient" and "mildly impaired," respectively. The report stated that Dr. Stern's "[w]ord retrieval" and "[l]earning and memory" were "mildly to moderately deficient" and "mildly to moderately impaired," respectively. In particular, when adjusted for age and education, Dr. Stern's "Immediate Memory Index" was found to be in the lowest two percent—that is, when Dr. Stern "was read some stories aloud then immediately asked to say them right back and recall them, he performed at the second percentile" of his peers. Dr. Stern's "Delayed Memory Index"—when he was asked to recall information 30 minutes later—measured in the fifth percentile among those of his age and education. Dr. Stern's "word list generation" also was in the fifth percentile, "[m]eaning 95 percent of the population similar to Dr. Stern would have performed better than Dr. Stern." Other than these learning and memory deficiencies,

---

[2] There is a dispute among the witnesses as to whether Dr. Fucetola prepared a "draft report," which is not in the record, in addition to the final report, which is in the record. We view all conflicts in the evidence in Dr. Stern's favor at the summary-judgment stage, and Dr. Stern appears to believe that the evidence of a "draft report"—which Dr. Fucetola denies existed and Fischer claims to have shredded—favors him. There is no evidence that the draft report differed from the final report in any way other than the lack of a definitive fitness-for-duty opinion.

the report indicates that Dr. Stern performed at least "within expectation" and "within normal limits."

In the report, Dr. Fucetola recommended that Dr. Stern "follow-up with his internist to discuss possible medical interventions for the memory disorder," and undergo repeated neuropsychological evaluation to determine if his "mild cognitive impairment (MCI)-amnesiac form picture" was progressive. Dr. Fucetola wrote: "Based on the results of this evaluation, Dr. Stern is not believed to be fit for duty in his current position as a hospital director of psychology." Dr. Fucetola continued: "The memory deficiencies observed in this exam would be expected to impact Dr. Stern's everyday functioning as a hospital director of psychology. At this point, his current constellation of administrative and clinical duties is believed to be excessive given the degree of memory impairment." Dr. Fucetola then discussed the following possible accommodations:

> [I]t is possible that currently Dr. Stern would be more likely to be able to complete routine clinical duties, including psychotherapy, by relying upon common strategies to compensate for the memory difficulty (i.e., making more written notes, completing documentation shortly after encounters, etc.). One possibility may be to eliminate administrative responsibilities including supervisory responsibilities, and structuring a lighter caseload, perhaps working less than full time, seeing fewer patients per week, and/or seeing less complex cases (e.g., nonsuicidal patients). Eliminating administrative duties and reducing or keeping stable

> clinical duties is likely to allow Dr. Stern to compensate for the memory difficulties more effectively. Other options could also be considered to reduce workload (e.g., adjusting the balance of inpatient and outpatient work). A one year interim plan with monitoring by a superior could be developed until it is determined whether Dr. Stern's memory disorder is in fact distinctly progressive.

In his deposition, Dr. Fucetola elaborated. "Because [during] the testing even remembering material a half an hour later [was] quite challenging, even though Dr. Stern was trying very hard," Dr. Fucetola was concerned that "there would be problems with [Dr. Stern] being able to converse with someone and then remember the content the next day, the next session." Dr. Fucetola said he was "not sure whether note taking would help or not," or whether "note taking is feasible or advisable in the scenario that Dr. Stern faces." Dr. Fucetola indicated that, during the testing, "verbal cues, a cue word here and there … did not help." Dr. Fucetola noted his "concerns" about Dr. Stern's ability to treat complex patients. He stated that the "breadth and severity" of Dr. Stern's "short-term memory loss" made it "improbable that Dr. Stern could effectively run the Psychology Department." He reasoned that "supervising and taking on responsibility for other mental health professionals requires a great deal of new learning," such as "new cases and new material," and Dr. Stern's "short-term memory loss precluded his ability to do that effectively."

Dr. Stern testified that Dr. Fucetola "was as objective as one could be." But while Dr. Stern did not "question the ac-

curacy of his test scores," he felt that Dr. Fucetola's "conclusions don't fit the complaints or the data." Specifically, Dr. Stern testified that he was able to "perform the essential functions of the job [he was] doing at [SAHC]."

On September 7, 2010, Fischer discussed Dr. Fucetola's report with Dr. Burch and Sister Anselma Belongea, SAHC's Vice-President of Professional Services. Dr. Burch and Fischer went "through the recommendations" offered by Dr. Fucetola as possible accommodations. With respect to the suggestion that Dr. Stern treat less complex patients, Fischer said that the Department did not divide patients into complex and noncomplex categories, and sometimes it is not "readily evident" whether a patient is complex, and "things may go south" during treatment and a less complex case can become complex. They discussed decreasing Dr. Stern's caseload, but there "was no part-time position in the department," which "would mean creating a new position for him." Fischer also felt there was no one in the Department qualified to supervise Dr. Stern, and "in order to supervise him you really would need somebody in the room with him while he was doing the counseling, and if you had somebody in the room with him, then why would you need two people?" Fischer also felt "it was not feasible to delegate [Dr. Stern's] administrative duties to anybody else in the department" because "there was no other supervisor in the department." Dr. Burch believed that taking simultaneous notes during sessions would distract from listening to the patient and Dr. Stern's memory problems meant that the "notes are going to be impaired" if he waited until the end of a one-hour session to write. Dr. Burch said, based upon the report and "from a medical standpoint," Dr. Stern was not

"able to see patients."[3] Fischer felt "there were liability issues, if a patient did commit suicide could [they] confidently say [they] did everything in [their power] to protect that patient, and given the report that [they] had in [their] hands, [they] could not confidently say that."

On September 15, 2010, Fischer and Belongea met with Dr. Stern. Dr. Stern had spoken with Dr. Fucetola after the evaluation, but he did not have a copy of Dr. Fucetola's report. Fischer and Belongea discussed the report in "broad strokes," and they "focused mainly on the conclusion … that [Dr. Stern] was not fit to be Director of Psychology." Dr. Stern, in an attempt to "scramble … to find any way … to slice [the] job so that [he could] keep it," suggested that his non-clinical duties be eliminated. Fischer responded that there was no opening for a part-time clinical psychologist. Dr. Stern suggested that they promote Dr. Baugher, the Department's other Ph.D.-level psychologist, to Chief Psychologist and allow him to take her job as a full-time clinical psychologist. Fischer responded that "currently that's not something that's available," and, "if you … are unable to do the administrative functions of your job, and those are essential, then I'm sorry, we don't have a position for you." Dr. Stern's employment with SAHC was terminated effective September 17, 2010.

---

[3] Dr. Burch testified that he did not recommend that Dr. Stern be fired, only that he was "asked at that point from a medical standpoint if [he] thought Dr. Stern, under the circumstances that existed at the time, was able to see patients, and [his] answer was no." Dr. Burch also testified that he was not aware of any patient complaints about Dr. Stern, and he was unaware of how Dr. Stern's job was divided between clinical duties and administrative duties.

Dr. Stern was not replaced. During the first few months after Dr. Stern was fired, Dr. Baugher and Fischer assumed his previous administrative and supervisory duties. In early 2011, SAHC merged the Psychological Services Department and the Employee Assistance Program. Ringhausen, formerly the Director of the Employee Assistance Program, assumed the role as the director of the newly-merged department. Dr. Stern's clinical caseload was absorbed by the other clinicians.

## II.     DISCUSSION

We review the district court's grant of summary judgment to SAHC *de novo*, and examine the record and all reasonable inferences in the light most favorable to Dr. Stern. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The ADA prohibits an employer from discriminating against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). In order to survive summary judgment, Dr. Stern had the burden of creating an issue of fact as to, among other things, whether he was a "qualified individual" at the time SAHC fired him.[4] *See Ammons v. Aramark Unif.*

---

[4] Under the ADA, there are two types of discrimination claims: failure to accommodate and disparate treatment. *See Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001). Dr. Stern contends that he asserted both types of claims before the district court, while SAHC contends that he only raised a disparate treatment claim before the district court and therefore any failure to accommodate claim has been waived on appeal. We need not resolve this issue because, in order to prove either claim, Dr. Stern would

*Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004). The ADA de-
fines a "qualified individual" as "an individual who, with or
without reasonable accommodation, can perform the essen-
tial functions of the employment position that such individ-
ual holds or desires." 42 U.S.C. § 12111(8). To determine
whether someone is a "qualified individual," we apply a
two-step test. "First, we consider whether the individual sat-
isfies the prerequisites for the position, such as possessing
the appropriate educational background, employment expe-
rience, skills, licenses, etc." *Basith v. Cook Cnty.*, 241 F.3d 919,
927 (7th Cir. 2001) (quotation omitted). "If he does, then we
must consider whether or not the individual can perform the
essential functions of the position held or desired, with or
without reasonable accommodation." *Id.* (quotation omit-
ted). There is no question that Dr. Stern satisfied the prereq-
uisites for the position of Chief Psychologist. At issue is Dr.
Stern's ability to perform the essential functions of the job,
with or without reasonable accommodation.

First, we identify the essential functions of the job. "The
factors we consider to determine whether a particular duty
is an essential function include the employee's job descrip-
tion, the employer's opinion, the amount of time spent per-
forming the function, the consequences for not requiring the
individual to perform the duty, and past and current work
experiences." *Gratzl v. Office of the Chief Judges of the 12th,
18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir.
2010) (quotation omitted); *see* 29 C.F.R. § 1630.2(n)(3) ("Evi-

be required to establish that he is a "qualified individual." *See Majors v.
Gen. Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013) (failure to accommodate);
*Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006) (dispar-
ate treatment).

dence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs."). In determining whether a particular duty is an essential function, "the employer's judgment is an important factor, but it is not controlling…. [W]e also look to evidence of the employer's actual practices in the workplace." *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 198 (7th Cir. 2011).

SAHC contends that the essential functions of the position of Chief Psychologist consist of the clinical, supervisory, and administrative duties discussed above. This contention is supported by Dr. Stern's testimony describing his job responsibilities and the percentage of time he spent on each category. It is also consistent with SAHC's job description, which was written by Dr. Stern.[5]

---

[5] The job description's "summary" states that the Chief Psychologist "[a]dministers and delivers psychological services to patients at Saint Anthony's Health Center, Behavioral Health Services and Post Acute Services. These services include biofeedback, pain management, consultation, psychological and neuropsychological testing administration, psychotherapy, treatment coordination, clinical supervision of psychotherapy/psychology staff and education/training. [The Chief Psychologist is] [r]esponsible for the management, evaluation, planning, organizing, and development of psychological services consistent with the mission, values, vision, and ethics of the Health Center."

At SAHC, there was only one Chief Psychologist. The position necessarily required the combination of all three elements: clinical practice, supervision, and administration. If, for example, the supervision element was eliminated, the employee would no longer be the "chief"; if the clinical-practice element was eliminated, the employee would no longer be functioning as a "psychologist." The evidence demonstrates as a matter of law that each of the elements constituted essential functions of the job. This case may be contrasted with a case involving one member of a team of employees working at an equal level. In a team environment, the ADA may require employers to think more flexibly about which functions are essential and what sorts of accommodations might be reasonable. *Cf. Miller*, 643 F.3d at 197–99 (reversing summary judgment for employer; evidence showing that bridge maintenance crew shared duties would allow jury to find that not every crew member needed to perform every duty, and that different allocations of duties could be reasonable accommodation).

We next consider if there is an issue of fact as to whether Dr. Stern can perform the essential functions of the position of Chief Psychologist *without* reasonable accommodation. Dr. Stern relies upon the following evidence to make this showing: (1) the 2009 performance evaluation; (2) the testimony of Carol Snook, Dr. Stern's administrative assistant; and (3) the testimony of Ann Marie Scheumbauer, Dr. Stern's wife.

Fischer issued Dr. Stern's 2009 performance evaluation on March 29, 2010, less than six months before he was fired. While the evaluation might be characterized as mixed (under "Standards of Behavior" he scored the highest possible

in the "Service," "Respect," and "Inspiration" subcategories, but scored the lowest possible in the "Health Center Goal" of "Patient Satisfaction" and failed to meet the goal in "Finance"), we assume that the evaluation was favorable overall. However, it is undisputed that neither Fischer nor anyone else in SAHC management became aware of the troubling reports concerning Dr. Stern's memory and cognitive issues until after Fischer issued the evaluation. The first two reports, from Sashidharan and Dr. Baugher in July 2010, indicated that Dr. Stern's memory was becoming progressively worse over the previous year and a half. Fischer's own experiences conformed to this hypothesis—she first noticed his memory issues in April or May 2010, and she did not question the competency of his treatment of her minor relative until June 2010, when she learned that Dr. Stern had failed to discover that the minor had been cutting herself for over a year. Dr. Fucetola's September 2010 report corroborated the earlier reports of memory issues. The relevant inquiry is whether Dr. Stern could perform the essential functions of his job at the time he was fired. *See Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) ("[A plaintiff's] ability to come to work, or to otherwise perform the essential functions of her job, is examined as of the time of the adverse employment decision at issue."); *cf. Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002) (holding that satisfactory performance evaluation and employee of the month award issued two months prior to Title VII plaintiff's termination does not create an issue of fact as to whether he was meeting his employer's legitimate expectations when his poor performance was discovered after the evaluation and the award—"the question is not whether at any time in [plaintiff's] employment he was meeting his em-

ployer's expectations; the question is whether he was meeting his employer's expectations at the time he was terminated"). We find that the 2009 performance evaluation does not create an issue of fact as to whether Dr. Stern was able to perform his job without accommodation at the time he was terminated.

Snook, Dr. Stern's administrative assistant, was asked in her deposition whether there were job-related tasks at SAHC that Dr. Stern "looked like he just couldn't do," and she responded: "I couldn't say whether he couldn't do them or not, but he had difficulty." Upon further questioning, she clarified that Dr. Stern had difficulty preparing "reports and things like that that required a lot of computer knowledge." She was then asked, "Did the work get done?" She responded: "As far as I know." On appeal, Dr. Stern argues that "the only proper inference at this stage is that [Snook's testimony quoted above] means [Dr. Stern was] performing the essential functions of his job." We disagree. Even viewing the evidence in Dr. Stern's favor, it is hard to characterize Snook's testimony as a ringing endorsement of his work performance. More importantly, Dr. Stern has failed to demonstrate the extent of Snook's knowledge of Dr. Stern's work activities—for example whether she observed his clinical sessions, sat in on staff meetings, and reviewed his reports—and whether she has the expertise and competence necessary to evaluate Dr. Stern's performance as a clinical psychologist and supervisor of other clinicians. Without such a foundation, a reasonable jury could not find that Snook's testimony rebuts Dr. Fucetola's professional opinion that Dr. Stern was "not believed to be fit for duty." Moreover, in light of the report that others in the Department were performing some of Dr. Stern's work, Snook's testimony that, "[a]s far as [she]

know[s]," Dr. Stern's "work [got] done" is not the same as testimony that Dr. Stern actually performed the work himself. We find Snook's testimony does not create an issue of fact as to whether Dr. Stern was able to perform his job without accommodation.

Scheumbauer, Dr. Stern's wife, submitted an affidavit indicating that, while Dr. Stern occasionally forgets "minor details," he remembers "important dates" like her birthday and their anniversary, and, while he occasionally "briefly struggle[s] to retrieve the correct word," he does not do so with greater frequency than she has "seen in political figures such as Governor Rick Perry of Texas, former President Ronald Reagan, or Justice Ginsburg of the U.S. Supreme Court." She stated that she has observed Dr. Stern "write reports for court proceedings, and track and bill his time for professional services" without difficulty, and she indicated that, as a school teacher, she would refer her students to Dr. Stern for counseling services. As with Snook, Dr. Stern fails to lay an adequate foundation establishing that Scheumbauer—who describes her educational degrees as being "in painting"—is competent to rebut Dr. Fucetola's professional opinion. Accordingly, Scheumbauer's testimony does not create an issue of fact as to whether Dr. Stern was able to perform his job without accommodation.

We next consider if there is an issue of fact as to whether Dr. Stern was able to perform the essential functions of his job *with* reasonable accommodation. Under the ADA, a "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, … the provision of qualified readers or interpreters,

and other similar accommodations for individuals with dis-abilities." 42 U.S.C. § 12111(9)(B). Dr. Stern relies upon Dr. Fucetola's report to argue that he should be entitled to reach a jury on the issue of whether he could perform the job with reasonable accommodation.

Dr. Fucetola's report suggested two categories of possible accommodations: (1) "relying upon common strategies to compensate for the memory difficulty," such as note-taking and completing documentation shortly after encounters; and (2) "eliminat[ing] administrative responsibilities including supervisory responsibilities, and structuring a lighter case-load." Dr. Fucetola suggested the development of a "one year interim plan with monitoring by a superior … until it is determined whether Dr. Stern's memory disorder is in fact distinctly progressive." We find Dr. Fucetola's suggestions to be insufficient to create an issue of fact as to whether Dr. Stern could perform the job with reasonable accommodation.

The first problem is Dr. Fucetola's lack of confidence in his proposed accommodations. His report states that "it is *possible* that currently Dr. Stern would be *more likely* to be able to complete routine clinical duties" by better note-taking and immediately completing documentation, and "[e]liminating administrative duties and reducing or keep-ing stable clinical duties is *likely* to allow Dr. Stern to com-pensate for the memory difficulties *more effectively*." In his deposition, Dr. Fucetola explained that he was "not sure whether note taking would help or not," or whether "note taking is feasible or advisable in the scenario that Dr. Stern

faces."[6] Dr. Fucetola was outright pessimistic about Dr. Stern's ability to perform his supervisory responsibilities (which Dr. Fucetola lumped together with Dr. Stern's administrative responsibilities), stating that "supervising and taking on responsibility for other mental health professionals requires a great deal of new learning," such as "new cases and new material," and Dr. Stern's "short-term memory loss precluded his ability to do that effectively." Dr. Fucetola did not indicate that he attempted to test the efficacy of any of his proposed accommodations during his sessions with Dr. Stern. Instead, he commented that, during testing he gave Dr. Stern "verbal cues, a cue word here and there" to help Dr. Stern's memory, but this "did not help."

In *Weigel v. Target Stores*, 122 F.3d 461 (7th Cir. 1997), we found that an affidavit from the plaintiff's psychiatrist stating that "there was a good chance" that she would be able to return to work with treatment was too conclusory and uninformative to support a conclusion that an accommodation of medical leave would have been successful. *Id*. at 469; *see id.* (affirming summary judgment in favor of the employer because of the plaintiff's inability to establish the existence of a genuine issue of fact on the question of her status as a qualified individual under the ADA). More recently, we affirmed summary judgment for an employer because the plaintiff failed to produce evidence that she was a qualified individual under the ADA when she produced "evidence that medication improved her condition" and "that she had hoped for

---

[6] Dr. Burch testified that taking simultaneous notes during sessions would distract from listening to the patient and Dr. Stern's memory problems meant that the "notes are going to be impaired" if he waited until the end of a one-hour session to write.

enough improvement to return to work regularly after leave," but failed to "present medical evidence regarding the effectiveness of her treatment." *Basden*, 714 F.3d at 1038. By contrast, in *Spurling*, 739 F.3d at 1062, we reversed a grant of summary judgment for an employer because the plaintiff satisfied her burden of "show[ing] that a reasonable accommodation could be made that would enable her to carry out the essential functions of her job." Specifically, the plaintiff produced "evidence suggest[ing] that a reasonable accommodation was readily available; [plaintiff] simply needed further medical testing and a prescription to control her narcolepsy." *Id*.

The summary judgment record in this case is more like that in *Weigel* and *Basden* than that in *Spurling*. The plaintiffs in *Weigel* and *Basden* relied upon a conclusory and untested opinion/hope that the proposed treatment/accommodation would enable them to perform the essential functions of their jobs. Dr. Fucetola likewise expresses a hope that "strategies to compensate for [Dr. Stern's] memory difficulty" and shedding most of Dr. Stern's duties "possibly" would allow him to perform his remaining duties effectively. But it is clear that Dr. Fucetola's suggestions were untested. Dr. Stern could have sought additional medical treatment or testing after his discharge, as the plaintiff in *Spurling* did, and could have obtained non-speculative, non-conclusory evidence that a proposed accommodation or treatment would have allowed him to adequately perform the essential functions of his job. Dr. Stern bore the burden of creating a genuine issue of fact as to whether he could perform the job of Chief Psychologist with reasonable accommodation, and Dr. Fucetola's speculative, untested suggestions were not adequate to satisfy that burden.

Another difficulty with Dr. Fucetola's suggestions is that they appear to be contingent upon SAHC eliminating essential functions of Dr. Stern's job, such as the supervisory responsibility. Dr. Fucetola indicated that the "breadth and severity" of Dr. Stern's "short-term memory loss" made it "improbable that Dr. Stern could effectively run the Psychology Department," and Dr. Stern's "short-term memory loss precluded his ability to … effectively" "supervis[e] and tak[e] on responsibility for other mental health professionals." As discussed above, the supervisory portion of the Chief Psychologist position constitutes an "essential function."

We have repeatedly held that "[t]o have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 534 (7th Cir. 2013); *see Gratzl*, 601 F.3d at 680 ("An employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee."); *Ammons*, 368 F.3d at 819 ("The … accommodation [plaintiff] offered … is not … an accommodation that would permit [plaintiff] to perform the essential functions of his job; instead it would change the essential functions of his job."). If a particular job function, such as Dr. Stern's supervisory responsibility, is an essential function, then it is irrelevant whether the employer could have someone else perform the function without undue hardship. *See Majors*, 714 F.3d at 535 ("The accommodation [plaintiff] seeks—another person to perform an essential function of the job she wants—is, as a matter of law, not reasonable, so [the employer] isn't required to show the accommodation would create an undue hardship."); *Gratzl*, 601 F.3d at 680 n.4 ("An employer is simply not required to

create … a new position to accommodate an employee under the ADA, regardless of the amount of hardship involved."). Dr. Fucetola opined that Dr. Stern's "short-term memory loss precluded his ability to … effectively" perform the supervisory portion of his job, and Dr. Fucetola failed to suggest an accommodation to allow Dr. Stern to perform this essential function. Accordingly, Dr. Fucetola's report is not sufficient for a jury to find that Dr. Stern could perform all of the essential functions of his job with reasonable accommodation.

Dr. Stern emphasizes that the ADA defines "reasonable accommodation" to include "job restructuring," and characterizes transferring his supervisory and administrative responsibilities as an example of such restructuring. The EEOC guidance elaborates on the meaning of "job restructuring" in the context of a reasonable accommodation, stating that "[j]ob restructuring includes modifications such as: reallocating or redistributing marginal job functions that an employee is unable to perform because of a disability; and altering when and/or how a function, essential or marginal, is performed." EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act: "Job Restructuring."[7] However, the EEOC guidance makes clear that "[a]n employer never has to reallocate essential functions as a reasonable accommodation, but can do so if it wishes." *Id*.

The type of restructuring that is required as a "reasonable accommodation" is illustrated in *Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958 (7th Cir. 2014). There we

---

[7] Available at www.eeoc.gov/policy/docs/accommodation.html#job.

reversed a grant of summary judgment to a nursing home that fired the plaintiff hairdresser because her doctor restricted her from pushing wheelchair-bound residents to and from the hair salon. We held that there was an issue of fact as to whether pushing wheelchairs was an essential function of her job, and therefore the nursing home's failure to consider reallocating the arguably marginal duty to other employees precluded summary judgment. *See id*. at 963 ("'Job restructuring' is one of the accommodations that an employer must consider. If a minor adjustment in the work duties of a couple of other employees would have enabled the plaintiff despite her disability to perform the essential duties of her job as a hairdresser, the nursing home's refusal to consider making such an adjustment was unlawful.") (citation omitted). The plaintiff in *Kauffman* spent only 1.71 hours of her 35-hour workweek pushing wheelchairs (less than 5% of her work time), whereas Dr. Stern estimates he spent 30%-50% of his work time on his supervisory duties and 15%-30% of his work time on his administrative duties. In this case, there is no factual dispute that the supervisory and administrative responsibilities were essential rather than marginal functions of Dr. Stern's job as Chief Psychologist. The applicable rule in this instance is that "[t]o have another employee perform a position's essential function … is not a reasonable accommodation." *Majors*, 714 F.3d at 534; *see Ozlowski v. Henderson*, 237 F.3d 837, 841 (7th Cir. 2001) ("While it is true that an employer may redistribute marginal functions of a job to other employees, an employer is not required to reallocate essential functions that the individual who holds the job would have to perform, with or without reasonable accommodation, in order to be considered qualified for the position.") (quotation omitted).

Dr. Stern also suggests that he could have been accommodated by switching jobs with SAHC's other Ph.D.-level psychologist, Dr. Baugher. Dr. Stern suggests that Dr. Baugher had designs on the Chief Psychologist job and would have welcomed the promotion. But regardless of Dr. Baugher's wishes, there is no evidence that SAHC viewed Dr. Baugher as an acceptable permanent Chief Psychologist. It is undisputed that Dr. Baugher did not possess two of the preferred qualifications set by SAHC for the position of Chief Psychologist—at least five years of hospital practice as a licensed psychologist (Dr. Baugher had only two) and previous management experience in psychological services. The question then is whether the ADA *required* SAHC to reassign Dr. Stern to Dr. Baugher's job.

It is true that "the ADA may require an employer to reassign a disabled employee to a different position as reasonable accommodation where the employee can no longer perform the essential functions of their current position." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir. 1996). However, "there are significant limitations on an employer's potential obligation to reassign a disabled employee as reasonable accommodation." *Id*. at 499. "An employer may be obligated to reassign a disabled employee, but only to vacant positions; an employer is not required to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee. Nor is an employer obligated to create a 'new' position for the disabled employee." *Id*. (citation omitted); *see Ozlowski*, 237 F.3d at 841 n.2 ("[A]n employer is not required to bump a current employee in order to provide reasonable accommodation."). Although the ADA requires an employer to consider reassigning a disabled employee to a job that would represent a demotion, *see Dalton v. Subaru-*

*Isuzu Auto., Inc.*, 141 F.3d 667, 678 (7th Cir. 1998), the em-
ployer's reassignment obligation is nonetheless limited to
*vacant* positions. *See id.* at 677; *see also Gratzl*, 601 F.3d at 680
n.4; *Gile*, 95 F.3d at 499. Dr. Stern failed to point to evidence
that SAHC had a vacant position for which he was qualified
at the time he was fired. *See Ozlowski*, 237 F.3d at 840 ("It is
the plaintiff's burden to show that a vacant position exists
for which he was qualified."). Indeed, Dr. Stern testified that
"there was no job opening at the time for a clinical psy-
chologist" in the Department.

Furthermore, even if we were to accept that the ADA
might require SAHC to restructure the Department in these
circumstances (as SAHC eventually did four months after
Dr. Stern was fired), Dr. Stern nonetheless would be re-
quired to produce evidence sufficient for a reasonable jury to
conclude that he could competently perform whatever es-
sential functions might remain assigned to him after the re-
structuring.[8] As we have discussed, Dr. Fucetola seemed
pessimistic about Dr. Stern's ability to perform his supervi-
sory responsibilities and noncommittal about his ability to
perform his clinical duties, even with the suggested accom-
modations. As discussed earlier, this leaves Dr. Fucetola's
opinion insufficient to create an issue of fact as to whether
Dr. Stern was able to competently perform just his previous
clinical duties (which constituted only 15%-25% of the over-

---

[8] In his reply brief, Dr. Stern also refers to the shedding of certain essen-
tial functions as a type of "part-time or modified work schedule" which
might be required as an accommodation by the ADA. 42 U.S.C. §
12111(9)(B). Regardless of the label Dr. Stern attaches to this proposed
accommodation—"restructuring" or "part-time or modified work
schedule"—our analysis of the proposed accommodation is the same.

all duties of his prior job)—or even a smaller slice of those already-limited duties, such as non-complex or non-suicidal patients.[9] *See Basden*, 714 F.3d at 1038; *Weigel,* 122 F.3d at 469. And apart from Dr. Fucetola's report, Dr. Stern points to no other evidence to show that he was able to perform the essential functions of his job *with* accommodation.

Dr. Stern argues that SAHC "never engaged in any interactive process with Dr. Stern to find any accommodations." On this point, we agree with Dr. Stern. While there is evidence Fischer, Dr. Burch and Sister Belongea discussed among themselves the accommodations suggested by Dr. Fucetola, no one at SAHC included Dr. Stern in the conversation until the termination meeting. By that time, viewing the facts in Dr. Stern's favor, the decisionmakers had already determined that Dr. Stern was going to be fired. This is not the "interactive process" envisioned—and mandated—by the ADA. Instead, "when an employee asks for an accommodation because of a disability," which Dr. Stern did as soon as he received Dr. Fucetola's report, "the employer must engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Kauffman*, 769 F.3d at 963 (quotation omitted); *see* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation.").

---

[9] Moreover, it is undisputed that, as Fischer stated, a patient may originally present as non-complex and later turn complex. This would entail potentially shuttling patients back and forth between therapists as the patient's "complexity" changes.

However, "[f]ailure of the interactive process is not an independent basis for liability under the ADA." *Spurling*, 739 F.3d at 1059 n.1. "Even if an employer fails to engage in the required process, that failure need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation." *Basden*, 714 F.3d at 1039; *Majors*, 714 F.3d at 535 ("This record wouldn't allow a finding that [the employee] was a qualified individual, so whether the discussion between [the employer] and [the employee] was sufficiently interactive is immaterial."). We have stated that an employer's failure to engage in the interactive process "is actionable 'if it prevents identification of an appropriate accommodation for a qualified individual.' Accordingly, [the employee] must show that a reasonable accommodation could be made that would enable her to carry out the essential functions of her job." *Spurling*, 739 F.3d at 1062 (quoting *Basden*, 714 F.3d at 1039). For example, in *Spurling*, the employee provided the employer notice that her doctor believed she had a condition covered under the ADA which caused her to fall asleep at work, but the employer "never contacted [the employee's doctor] to determine the severity of [the employee]'s ADA claim or how it might be able to provide a reasonable accommodation," and instead fired the employee with no further interaction. *Id*. We found that "[t]he evidence suggests that a reasonable accommodation was readily available; [the employee] simply needed further medical testing and a prescription to control her narcolepsy." *Id*. Likewise, in *Kauffman*, the employee created an issue of fact as to whether "a minor adjustment in the work duties of a couple of other employees would have enabled the plaintiff despite her disability to

perform the essential duties of her job as a hairdresser," and if the jury agreed, "the [employer]'s refusal to consider making such an adjustment was unlawful." 769 F.3d at 963.

As is evident in *Spurling* and *Kauffman*, as well as Dr. Stern's case, an employer's refusal to interact has a tendency to curtail the record, which in turn can frustrate judicial review. But regardless of the state of the record, an employer's failure "to engage in the required [interactive] process … need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation." *Basden*, 714 F.3d at 1039. Unlike the employer in *Spurling*, who fired the plaintiff without attempting to obtain a medical evaluation of her capabilities, SAHC retained Dr. Stern's hand-picked evaluator, Dr. Fucetola. More importantly, in *Spurling* and *Kauffman*, despite the limited record, we found that each plaintiff satisfied her initial burden of producing competent evidence sufficient for a jury to find that she was a qualified individual under the ADA. By contrast, Dr. Stern has failed to produce adequate evidence that he is a qualified individual, capable of performing the essential functions of his job with or without reasonable accommodation. Therefore, this case falls into the category of cases in which an employer's alleged failure to adequately engage in the interactive process is immaterial. *See Basden*, 714 F.3d at 1039 ("Because there was no evidence permitting a conclusion that [employee] was a qualified individual for ADA purposes, the district court correctly entered summary judgment for [the employer] on her ADA claim despite any shortcomings in [the employer]'s response to her [accommodation] request."); *Majors*, 714 F.3d at 535 (same); *Ozlowski*, 237 F.3d at 840 (same).

We do not believe that our ruling erects an unreasonable hurdle for ADA plaintiffs such as Dr. Stern. If in fact Dr. Stern is capable of performing the essential functions of his job, it should have been within his power to procure evidence sufficient for a jury to find him to be a "qualified individual." For example, if Dr. Stern performed a comparable job after his termination, he could produce evidence that he adequately performed that job's essential functions.[10] Or Dr. Stern could have sought additional expert medical or vocational evaluation of his capabilities with or without accommodation.[11] Instead, Dr. Stern relied upon evidence insufficient to create an issue of fact. *Cf. Basith*, 241 F.3d at 930 ("[Plaintiff] provides no evidence to substantiate this claim [that he could perform the job with a wheelchair], such as a report from his doctor that he could fully perform the delivery function with his proposed wheelchair.… [Plaintiff]'s bare assertion that a wheelchair would accommodate his inability to perform delivery of medications is sheer speculation.").

---

[10] On appeal Dr. Stern does not cite to evidence describing his post-SAHC employment. Before the district court, the parties referred to Dr. Stern's then-current employment as "providing evaluations for use in court proceedings," but no specifics were offered to show that this employment was comparable to his job at SAHC, i.e., providing long-term clinical treatment and supervising other clinicians.

[11] While we do not think that expert testimony was necessarily required for Dr. Stern to show he was a qualified individual, some of the essential functions of his job—practicing clinical psychology and supervising other clinicians—involve duties that are likely beyond the experience of most jurors. We suspect that the more a job's essential functions are outside the competence of a typical juror, the more likely expert testimony may assist in proving an ADA plaintiff's case.

We conclude by noting that, while we are troubled by SAHC's failure to meaningfully engage in the interactive process, we think it is appropriate for an employer such as SAHC to consider the sensitive nature of an employee's position when evaluating potential accommodations. During the decisionmaking process, Fischer and Dr. Burch clearly were mindful of the fact that SAHC is an acute-care facility and Dr. Stern's position required him to be solely responsible for the clinical treatment of high-risk patients, most of whom were children. Dr. Burch opined that, based upon Dr. Fucetola's report and "from a medical standpoint," Dr. Stern was not "able to see patients."[12] Fischer was concerned that no one in the small department was available or qualified to sit in on Dr. Stern's clinical sessions, and she felt "there were liability issues, if a patient [of Dr. Stern's] did commit suicide," given the information in Dr. Fucetola's report. Fischer had already transferred her minor relative's treatment to a different psychologist based upon her own concerns, even before learning of the concerns of Dr. Stern's co-workers and Dr. Fucetola. It is fair to surmise that, if told of the contents of Dr. Fucetola's report and the comments of Sashidaran, Dr. Baugher, Ringhausen, and Fischer, few parents would vol-

---

[12] Dr. Stern argues that Dr. Burch's comment that Dr. Stern should not "practice psychology," said in reaction to Dr. Fucetola's report, constitutes direct evidence of discrimination by SAHC. However, to establish disability discrimination, even using direct evidence, a plaintiff must establish that he is qualified to perform the essential functions of his job either with or without reasonable accommodation. *See Bekker v. Humana Health Plan, Inc.,* 229 F.3d 662, 669–70 (7th Cir. 2000). Because Dr. Stern has failed to create an issue of fact as to this threshold "qualified individual" issue, we need not consider any other elements of his claim of disability discrimination.

unteer their troubled children to act as guinea pigs for test-ing the efficacy of proposed accommodations such as note-taking or reduced responsibilities. We have held that an em-ployer does not have to wait for a disabled employee in a sensitive position to injure someone before it can evaluate the employee's fitness for duty, and, once evaluated, the employer is "entitled to rely on a physician's recommenda-tion" that the employee is not able to safely perform an es-sential function of his job. *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1129 (7th Cir. 2006).

It is reasonable to require an employer to accommodate a disability by, for example, diverting a few minutes of an or-derly's time to push wheelchairs to a hair salon (*Kauffman*) or giving an employee a month of leave for her medical condi-tion to be diagnosed and controlled with medication (*Spurl-ing*). It seems less reasonable to require SAHC to knowingly allow a psychologist with a documented memory impair-ment—whose immediate memory scored in the lowest two percent of the comparable population—to treat patients without meaningful supervision at an acute-care facility. A hospital in such a situation may rightly be concerned about the risk to the health and safety of its patients. While the law sometimes requires an employer to tread carefully, based upon this scant record, Dr. Stern asked SAHC to step further than the ADA required. The ADA does not require an em-ployer to walk "on a razor's edge—in jeopardy of violating the [ADA] if it fired such an employee, yet in jeopardy of be-ing deemed negligent if it retained him and he hurt some-one." *Palmer v. Circuit Court of Cook Cnty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997). We do not mean to suggest that concern for patient safety or fear of malpractice liability relieved SAHC of the obligation to seriously engage in the interactive

process—it did not, as we have said—but we do think it is entirely proper for an employer assessing the reasonableness of a proposed accommodation to consider the sensitive nature of the employee's position and the potential safety and liability risks involved. *Cf. Emerson v. N. States Power Co.*, 256 F.3d 506, 513 (7th Cir. 2001) (holding that a phone operator who answered "safety-sensitive calls" regarding gas and electrical emergencies 5%-10% of the workday, and who was susceptible to anxiety attacks, failed to create an issue of fact as to whether she was a qualified individual under the ADA).[13] This consideration also underscores the importance of the requirement that, even when the employer fails to adequately interact, a plaintiff must come forward with non-speculative evidence "show[ing] that a reasonable accommodation could be made that would enable her to carry out the essential functions of her job." *Spurling*, 739 F.3d at 1062; *see Basden*, 714 F.3d at 1039; *Majors*, 714 F.3d at 535.

Dr. Stern points to no evidence that would allow a trier of fact to determine that he was a "qualified individual," as defined by the ADA. Accordingly, the judgment of the district court is AFFIRMED.

---

[13] In *Emerson*, in addition to finding no issue of fact as to whether the plaintiff was qualified under the ADA's "routine 'qualified individual' framework," we came to the same conclusion under the "direct threat" framework, which provides that "[a]n employee is not a qualified individual if she poses 'a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.'" *Emerson*, 256 F.3d at 513–14 (quoting 42 U.S.C. § 12111(3)). Because the "direct threat" framework has not been raised by either party, we decline to address its possible application to the facts of this case.