In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1511

CARRIS JAMES,

*Plaintiff-Appellant*,

*v.*

HYATT REGENCY CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cv-07873—**Milton I. Shadur,** *Judge.*

ARGUED OCTOBER 22, 2012—DECIDED FEBRUARY 13, 2013

Before BAUER and ROVNER, *Circuit Judges*, and RANDA,
*District Judge*.[*]

BAUER, *Circuit Judge*.  James has been an employee
of Hyatt Regency Chicago ("Hyatt") since 1985. In
April 2007, James took a leave of absence due to an eye

[*] The Honorable Rudolph T. Randa, District Judge of the
United States District Court for the Eastern District of Wiscon-
sin, sitting by designation.

injury that occurred outside of work. James filed suit in 2009 claiming that Hyatt violated his rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., as well as the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. During discovery, the district court denied James' motions to compel and awarded Hyatt a portion of attorney's fees it expended responding to Plaintiff's motions pursuant to Federal Rule of Civil Procedure 37(a)(5)(B), and subsequently granted Hyatt's motion for summary judgment on all of James' claims. For the following reasons, we affirm.

## I. BACKGROUND

James has been continuously employed as a banquet steward at Hyatt, a hotel in downtown Chicago, since 1985. When James applied to Hyatt, he noted on his application that he had a vision problem that is correctable with eyeglasses and magnifying glasses. Hyatt was aware that James was nearsighted and accommodated him by increasing the print size of his work assignments and schedules.

As a banquet steward, James is responsible for maintaining the cleanliness of Hyatt's banquet and other food-service areas, as well as transporting food items and equipment. Specifically, according to the testimony of his supervisors as well as Hyatt's written job description, James' position required him to lift pots and pans and transport garbage cans around Hyatt's banquet and food-service area.

In March 2007, James was involved in an altercation outside of work and was punched in the eye. James developed a retinal detachment in his left eye in the weeks following the altercation. In April 2007, James underwent corrective surgery and had to miss work in order to recuperate.

Hyatt's Human Resources Department learned that James' absence was attributable to a medical issue, and provided him with information regarding FMLA leave. As required under the FMLA, Hyatt's policies provide for twelve weeks of job-protected leave for eligible employees. On April 24, 2007, James provided Hyatt's Human Resources Coordinator with a note from his doctor, Dr. Scott, stating that James could return to "light duty" on May 10, 2007. The note did not list any specific restrictions, nor did it say how long James must remain on light duty. The next day James requested FMLA leave; the request was granted and Hyatt applied FMLA retroactively to cover James' absence prior to his submission of the certification form.

On May 9, 2007, James provided Hyatt with an authorization for the release of his health information "for the purposes of authorizing a medical leave." James provided Hyatt, and its short-term disability provider, with a substantial amount of disability benefit paperwork that represented that he was unable to work in any capacity. James subsequently received disability benefits based upon those representations.

On May 11, 2007, James submitted an FMLA certification form to Hyatt which stated that James required con-

tinued FMLA leave because he was unable to work in any capacity. Dr. Scott noted on the form that James' condition was probably longstanding and most likely occurred before his initial visit with the doctor. The form further stated that this condition could possibly incapacitate James permanently.

James' twelve week FMLA leave ended July 13, 2007. The collective bargaining agreement between his union and Hyatt, however, entitled James to remain on job-protected leave for up to one year from his original absence. On August 2, 2007, James submitted to Hyatt a release from Dr. Scott that stated that James was allowed to return to work on August 5, 2007, with the restriction of being "visually impaired." James testified that Hyatt's Human Resources Coordinator told him that he could not return to work with restrictions. James did not return to work on August 5, and then continued to submit paperwork from Dr. Scott representing that James was incapable of working in any capacity. Forms provided by Dr. Scott stated he was "not sure" when James could return to work (May 11, 2007 and June 14, 2007 forms), that James would be unable to work until August 20, 2007 (June 1, 2007 form), and that James would be disabled until August 5, 2007 (August 2, 2007 form). Based upon James' request, and Dr. Scott's representations of James' condition, Hyatt completed all necessary disability paperwork.

On September 25, 2007, James faxed Hyatt a note from Dr. Matchinski, a different doctor, indicating that James could return to work with the restrictions of "no

heavy lifting or excessive bending." Dr. Matchinski's note made no reference to any "visual impairment." Hyatt then attempted to contact James in September, and again in December, to seek additional information as to the specifics behind his restrictions and the conflicting paperwork he was submitting. However, months went by and James offered Hyatt no further clarification of his condition. On January 15, 2008, James Parsons, Hyatt's Workers' Compensation and Safety Manager, sent a letter directly to Dr. Scott requesting clarification of James' medical condition. Parsons enclosed with the letter a return-to-work certification form as well as a job analysis for James' position. On January 28, 2008, Dr. Scott responded stating that James could return to work but could not complete any task that required vision better than 20/200. After receiving Dr. Scott's letter, Hyatt scheduled a meeting with James to discuss his return. During that meeting James requested, and was granted, two weeks of paid vacation.

On February 17, 2008, James returned to work in the same position, shift, and seniority level as before his leave of absence. James testified that he felt he was treated fairly during the FMLA application process and that no one at Hyatt has said anything negative to him regarding his leave, eye surgery, or visual impairment. Nonetheless, James filed suit in 2009, alleging claims of retaliation and interference with his rights under the FMLA and discrimination and retaliation under the ADA. Ultimately, the district court found that James failed to present a genuine issue of material fact as to any of his claims, and granted summary judgment to Hyatt.

## II. DISCUSSION

James' claim in this case is unique in that he does not deny he asked for and was granted FMLA benefits by Hyatt; rather he contends that he was left on FMLA leave too long. In support of this claim, James argues that Hyatt failed to promptly return him to work after his submission of various "releases" from his physicians. The district court granted summary judgment in favor of Hyatt and dismissed James' FMLA and ADA claims. The district court also denied James' motion to compel further discovery, and subsequently imposed Rule 37 sanctions. James now appeals the district court's decision to grant summary judgment, as well as the district court's denial of his motions to compel discovery and the assessment of sanctions. We review each of James' arguments in turn.

### A. FMLA Interference Claim

James first contends that the district court improperly granted summary judgment on his FMLA interference claim. We review a district court's grant of summary judgment *de novo. Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Darst*, 512 F.3d at 907.

The FMLA makes it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise rights under the FMLA. 29 U.S.C. § 2615(a)(1). An employee on FMLA leave has the right to be restored to the same or an equivalent position that the employee had before he took leave. 29 U.S.C. § 2612. However, if an employee cannot perform an essential function of their original position because of a physical or mental condition, the employee has no right to restoration to a different position under FMLA. 29 U.S.C. § 825.216(c).

In order to succeed in an FMLA interference claim, James "must show that: (1) he was eligible for the FMLA protections; (2) his employer was covered by FMLA; (3) he was entitled to take leave under FMLA; (4) he provided sufficient notice of [his] intent to take leave; and (5) [his] employer denied [him] FMLA benefits to which he was entitled." *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010). Hyatt does not dispute that James was eligible and entitled to take FMLA leave, and that James supplied notice of his intent to take FMLA leave. So our focus turns to the fifth element, whether a reasonable jury could find that Hyatt denied James any FMLA benefit.

As we have noted, this is a unique claim in that James concedes he was granted the full twelve weeks of FMLA leave; rather James contends he was wrongfully prohibited from returning to work prior to the expiration of his FMLA leave on July 13, 2007. Specifically, James argues that Hyatt interfered with his FMLA en-

titlement when it did not promptly reinstate him to his position when he presented the April 24 doctor's note that released him to "light duty" starting on May 11, 2007.[1] In support of his argument, James relies upon *Brumbalough v. Camelot*, 427 F.3d 996 (6th Cir. 2005). In *Brumbalough*, the plaintiff submitted a doctor's note that stated, in its entirety, "[Linda Brumbalough] may return to work on 8/13/01[.] She should only work a 40-45 hour work week and limit her out of town travel to 1 day per week." *Id.* at 1004. Her employer rejected this certification as insufficient and requested that Brumbalough submit additional documentation before she was allowed to return to work. *Id.* The Sixth Circuit court held "that once an employee submits a statement from her health care provider which indicates that she may

---

[1]  In total, James submitted five doctor's notes to Hyatt, which he characterizes as "physician releases." Only three of those doctor's notes fall within the relevant time frame of James' FMLA leave: the April 24 note, the May 11 note, and the July 10 note. We agree with the district court and reject James' May 11 note and July 10 note as physician "releases." On both of those doctor's notes the question is asked, "If medical leave is required for the employee's absence from work because of the employee's own condition (including absences due to pregnancy or a chronic condition), is employee unable to work of any kind?" [sic]. On both the May 11 and the July 10 release form, James' physician checked the box marked "yes" indicating that James was unable to return to work in any capacity. Therefore, the only relevant physician's release that falls within the requisite time frame of James' FMLA leave is the April 24 note.

return to work, the employer's duty to reinstate her has been triggered under the FMLA." *Id*. We agree with the holding in this case, and further the FMLA requires an employer to restore an employee to the position held at the time FMLA leave began or "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). However, an employer has no duty under the FMLA to return an employee to his or her position, if that employee cannot perform an essential function of the job. *See* 29 C.F.R. § 825.214(b).

The crux of James' argument on appeal is that Hyatt violated the FMLA on April 24, 2007 when it did not promptly reinstate him to his position after he submitted a doctor's note releasing him to "light duty" beginning on May 10, 2007. We disagree. First, the April 24 note James submitted did not release him to return to work in any capacity until May 10, 2007. We do not see how Hyatt violated James' FMLA benefits by not returning him to work on April 24, when his own physician release stated he could not return until May 10, 2007. Second, the April 24 note only permitted James to return to work on "light duty" beginning May 10, 2007; the note did not specify when James' "light duty" restriction would be lifted. The FMLA only requires that an employer permit an employee to take up to twelve weeks of unpaid leave for illness and return to his prior post or an equivalent position. *Id*. Employers are under no obligation to restore an employee to his or her position if the employee is unable to perform the essential functions of the job. As

noted by the district court, we have held that, "[t]here is no such thing as 'FMLA light duty'" *Hendricks v. Compass Group, USA, Inc.*, 496 F.3d 803, 805 (7th Cir. 2007). See 29 C.F.R. §§ 825.220(d) and 825.702(d) (providing that an employee may take "light duty" under workers' compensation or may continue with unpaid FMLA leave). Third, James then represented to Hyatt, through disability paperwork and additional doctor certifications, that he was completely unable to work in any capacity and required disability benefits. We agree with the district court that even when the evidence in this case is viewed in the light most favorable to James, Hyatt is entitled to summary judgment because James has failed to show that Hyatt interfered with his FMLA benefits.

### B. FMLA Retaliation Claim

James next argues that the district court erred in granting summary judgment on his FMLA retaliation claim. Under the FMLA, employers are prohibited from retaliating against an employee who exercises or attempts to exercise FMLA rights. 29 U.S.C. § 2615(a)(2). In other words, the employer cannot use an employee's use of FMLA leave as a negative factor in promotion, termination, and other employment decisions. *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 978 (7th Cir. 2008). "We evaluate a claim of FMLA retaliation the same way that we would evaluate a claim of retaliation under other employment statutes." *Buie v. Quad/Graphics Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). A plaintiff making a claim for retaliation under the FMLA can proceed under the

direct or indirect methods of proof. *Id*. James proceeds under both the direct and indirect methods but his retaliation claim, which is really just a reformulation of his FMLA interference claim, fails because James produced no evidence of a materially adverse action.[2]

Under both the direct and indirect methods, the plaintiff must present evidence that a materially adverse action was taken by their employer. *See Daugherty v. Wabash Center Inc.*, 577 F.3d 747, 751 (7th Cir. 2009); *Simpson v. Office of Chief Judge of Circuit Ct. of Will Cnty.*, 559 F.3d 706, 718 (7th Cir. 2009). James contends that Hyatt's "refusal" to reinstate him after the submission of his April 24 doctor's note was a materially adverse employment action. For an employer's action to be defined as "materially adverse" it must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Nagle v. Vill. of Calumet Park*, 554

---

[2] James concedes that he is unable to establish a prima facie case of FMLA retaliation under the indirect method. James blames this fact on the district court's denial of his motion to compel discovery. We find this to be a misstatement of the record and will address the denial of James' motion to compel, and resulting sanctions, in turn. Next, James argues that we lessened the *McDonnell Douglas* burden in *Coleman v. Donahue*, 667 F.3d 835, 863 (7th Cir. 2012) and he therefore does not have to establish a prima facie case under the indirect method. This is a misstatement of the holding in *Coleman* and we do not interpret the concurring opinion in that case as lessening a plaintiff's burden to establish a prima facie case under *McDonnell Douglas.*

F.3d 1106, 1120 (7th Cir. 2009) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). For example, a "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady*, 993 F.2d at 136 (citations omitted). Here, Hyatt's "refusal" to reinstate James after the submission of his April 24 doctor's note is not a materially adverse employment action. As we discussed above, Hyatt did not violate the FMLA by not returning James to work on April 24, when he submitted a doctor's note releasing him to return to work on "light duty" on May 10. Further, James submitted the April 24 "light duty" note one day prior to submitting, and Hyatt granting, James' FMLA leave request. Therefore, confusingly, James argues that Hyatt granted his request for FMLA leave, and then nearly simultaneously retaliated against him for taking it.

Actually the record in this case indicates that Hyatt attempted on multiple occasions to return James to work. Hyatt's Human Resources Department reached out to James in September 2007 and again in December 2007, seeking clarification of the conflicting documents he was submitting. James never responded to these requests. Finally, in January 2008, Hyatt reached out directly to James' physician, Dr. Scott, to request clarification. Thirteen days later, Dr. Scott responded by stating that James could return to work but could not complete any task that required vision better than 20/200. After

Hyatt received Dr. Scott's letter, they scheduled a meeting with James to discuss his return, and during that meeting James requested, and was granted, two weeks of paid vacation. James returned to work on February 17, 2008 to the same position, shift, and seniority level as before his leave of absence. Therefore, James has failed to provide evidence sufficient to prove his claim under either the direct or indirect method.

### C. ADA Failure to Accommodate Claim

James also claims that Hyatt failed to accommodate him as required under the ADA. To establish a prima facie case for failure to accommodate, "a plaintiff must show that: (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability." *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011). To survive a motion for summary judgment, a plaintiff must present the court with evidence that, if believed by a trier of fact, would establish all three elements of his claim. *Id.* Additionally, "the standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches," *Jovanovic v. Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000). Even assuming that James' vision impairment amounts to a disability under the ADA, James fails to put forth sufficient evidence to indicate that Hyatt failed to accommodate him.

James argues that by rejecting his requests to return to work via his doctor's "releases," Hyatt violated the ADA by failing to accommodate James' vision problems,

with the same accommodations they have provided him for the past twenty years of employment. It is well-established under the ADA, that an employee begins the accommodation "process" by informing his employer of his disability; at that point, an employer's "liability is triggered for failure to provide accommodations." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996). But based on the evidence before us, Hyatt did not receive notification as to the true state of James' medical condition until Hyatt proactively reached out to James' physician in January 2008 for clarification. Prior to that point, James was simultaneously submitting conditional doctor releases, along with paperwork indicating he was completely incapable of working—all while failing to respond to Hyatt's requests for clarification as to the true nature of his condition. James argues that the conflicting medical documentation he submitted creates a materially disputed fact as to whether or not James could return to work. We find that circular reasoning does not establish a prima facie case showing Hyatt failed to accommodate him.

In this case, James' conditional releases from his doctors restricted him from performing essential functions of his position. For example, in the September 25 note, James' doctor represented that he could return to work under the restriction of "no heavy lifting or excessive bending over"—two essential functions of his position. Reassigning such tasks to another employee is not considered a reasonable accommodation when reassignment of the task would equate, essentially, to reassignment of the job itself. *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 199 (7th Cir. 2011).

The core of James' accommodation argument is that if he did not have a visual impairment, Hyatt would not have prohibited him from returning to work for ten months. The undisputed facts in this case do not support that conclusion. Rather, as we have previously discussed, the record indicates that James' submissions of medical documentation representing that he was incapable of working kept him from returning to work. Further, we believe a trier of fact could not find that Hyatt suddenly decided not to extend James the same accommodations for his visual impairment that he was afforded during the prior twenty years of his employment at Hyatt.

### D.  ADA Disparate Treatment Claim

On appeal, James presents an ADA disparate treatment claim for the first time. James failed to articulate this theory or support it with any facts in the district court, and thus has waived the argument. *See Local 15, Int'l Bhd. of Elec. Workers v. Exelon Corp.*, 495 F.3d 779, 783 (7th Cir. 2007) ("'A party waives any argument that it does not raise before the district court or, if raised in the district court, it fails to develop on appeal.'"(quoting *Williams v. REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002))).

### E.  Denial of James' Motion to Compel and Rule 37 Sanctions

During the arduous discovery process in this case, the parties had the benefit of eighteen months of discovery where James was provided with several thou-

sand documents in response to his written discovery requests, and deposed every one of Hyatt's witnesses. Then on June 22, 2010, James brought several motions to compel further discovery responses and requests for production. These motions were denied on June 24, 2010. The next day, James filed additional motions to compel virtually the same discovery requests. The district court again denied these motions and awarded Hyatt attorney's fees incurred in responding. Originally, Hyatt sought payment of $5,112.50, the amount billed for the associate and co-counsel to respond to and attend the hearing on James' motions to compel. The district court considered the time spent and the fees incurred by Hyatt and determined only the primary associates fees were reasonable under the circumstances and reduced the fees awarded to $3,975.00. The district court ordered James to pay Hyatt $3,975.00. Several months passed and James failed to comply with this order. Ultimately, the district court intervened and ordered James' attorney to reimburse Hyatt directly, noting that it "could well have just brought [Section] 1927 into play, place[d] the obligation directly on [him], in which case [he] would have a problem in recovering from [his] client." James now appeals both the denial of his motions to compel discovery, as well as the resulting sanctions.

First, we note that district courts have broad discretion in discovery matters, and therefore this court reviews the denial of motions to compel discovery for an abuse of discretion. *See Kalis v. Colgate–Palmolive Co.*, 231 F.3d 1049, 1056 (7th Cir. 2000). We shall not reverse the

district court's ruling absent a clear showing that the denial of discovery resulted in actual and substantial prejudice to James. *See Packman v. Chicago Tribune Co.,* 267 F.3d 628, 646 (7th Cir. 2001).

Despite James' arguments to the contrary, we find no evidence in the record to support his contention that the district court abused its discretion in denying his motions to compel. One of the many discovery requests at issue sought to compel Hyatt to provide James with all documents relating to all Hyatt employees (including their names, addresses, and telephone numbers) who requested FMLA leave, ADA leave, or any other type of medical leave from August 2002 to the present date. At the time James made this request that amounted to over 2,400 leaves of absence, according to Hyatt. Further, James was not prejudiced by the denial of this overly broad request, especially in light of the fact that the parties had engaged in extensive discovery. We agree with the district court that James is not entitled an additional fishing expedition, in hopes of finding a new way to reshape the facts, because he failed to obtain the answers he had hoped for during the previous eighteen months of discovery.

We therefore find no abuse of discretion in the district court's denial of James' motion to compel discovery.

We next address the issue of the assessed sanctions in this case. "[W]e review all discovery sanctions for abuse of discretion and will uphold a district court's decision so long as it could be considered reasonable." *Collins v.*

*Illinois*, 554 F.3d 693, 696 (7th Cir. 2009). Under Rule 37(a)(5)(B), if a motion to compel is denied, a court "must after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees." James argues that he was denied a meaningful opportunity to be heard because he did not know the district court would issue sanctions against him on July 27, 2010, and therefore had not prepared a response. Again, we disagree. The record indicates that the district court thoughtfully attempted to lead James' attorney towards a more reasonable and appropriate approach to the discovery process, and he declined to follow on multiple occasions. The district court found that rather than using discovery as a tool to uncover facts and evidence to support his case, James was using unreasonable discovery requests as a weapon against Hyatt. The district court in this matter fully discharged its obligation to craft reasonable sanctions. We find no abuse of discretion and reject James' appeal of the district court's sanctions.

## III. CONCLUSION

Accordingly, for the foregoing reasons, we affirm the decision of the district court.