In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-1779

PAULA MCALLISTER,

*Plaintiff-Appellant,*

*v.*

INNOVATION VENTURES, LLC, doing business as Living Essential

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 17-CV-00867 — **Jon E. DeGuilio**, *Judge.*

ARGUED NOVEMBER 13, 2020 — DECIDED DECEMBER 30, 2020

Before FLAUM, ROVNER, and BRENNAN, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff Paula McAllister suffered serious injuries in a car accident in June 2016. In the following months, her treating physicians repeatedly concluded she could not yet return to work for her employer, defendant Innovation Ventures, LLC. Innovation provided her with medical leave and short-term disability benefits while she sought treatment. Once it became clear that McAllister likely could

not return to work until at least February 2017, Innovation ter-minated McAllister. McAllister sued Innovation. As relevant on appeal, she claimed Innovation failed to accommodate her during the summer of 2016 in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* Because we agree with the district court that McAllister was not a "quali-fied individual" under the ADA, we affirm.

## I. Background

McAllister worked for Innovation, the producer of the popular liquid dietary supplement 5-hour ENERGY. Through a staffing agency, McAllister began working as an assembly worker in October 2014. She soon directly applied to and was hired by Innovation as an assembly worker, which sometimes entailed "rework,"[1] and she later became a machine operator.

On June 10, 2016, an unfortunate automobile accident left McAllister with serious head and back injuries. At the hospi-tal, spinal surgeon Dr. Jeffrey Kachmann performed spinal surgery on McAllister and treated her for several injuries: a herniated disc, spinal cord compression, central cord syn-drome (which often weakens motor and sensory functioning), a closed-head injury, and a "complex," "multi-direction lac-eration."

Shortly after her injury, McAllister sought short-term dis-ability benefits and medical leave under the Family and Med-ical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601 *et seq.* Dr. Kachmann's office submitted an FMLA certification indicat-

---

[1] "Rework," also known as "reprocessing," was a periodic duty that Inno-vation assigned its employees, but it was not an independent job. McAl-lister's rework required her to conduct quality checks on certain products.

ing that McAllister had "central cord syndrome" and a "significant head injury" with "some posttraumatic subarachnoid hemorrhage and some possible posttraumatic superficial brain contusion." On the certification, where asked what job functions McAllister "[was] unable to perform," Dr. Kachmann wrote she could not perform "any & all" functions. He estimated that McAllister could not return to work until September 8, 2016. McAllister also sought short-term disability benefits. Guardian, Innovation's benefits provider, granted these benefits partially based on Dr. Kachmann's view that she was "totally disabled (unable to work)" and his estimate of a September return.

McAllister asked Innovation's human resources department whether she could return to work before receiving a complete medical clearance, as her doctors had imposed restrictions on how much she could lift. According to McAllister, Innovation refused, telling her that "all restrictions had to be lifted before [she] could return to work because that was the policy that the company had used."

Thereafter, McAllister fell into a frustrating cycle wherein her doctors would examine her, predict she could return to work in some number of weeks, then later elongate their prediction at a follow-up visit. On August 24, 2016, as her expected September 8 return approached, she met with April Christlieb, Dr. Kachmann's physician assistant. Christlieb wrote a report that she faxed to Innovation indicating that McAllister may be getting a "little bit better" but that she had hip and knee pain, foot swelling, some balancing issues, and post-concussion symptoms. Christlieb concluded, "I don't feel at this time she is quite ready to go back to work."

On October 3, 2016, McAllister again met with Dr. Kachmann's office, which sent Innovation a work status report restating that McAllister still could not return to work. Despite her desire to return, McAllister recalled experiencing balance, dizziness, and memory loss issues, and some "difficulty getting words out." Her doctors told Innovation that McAllister needed a neuropsychological evaluation before they could clear her and estimated that would take at least six more weeks.

In the interim, Innovation's human resources department reached out to McAllister because her FMLA leave had expired. At an October 26, 2016 meeting, McAllister notified the department that she still could not return to work. Innovation told her that, per its policy, an employee unable to return to work after six months of leave would be terminated. McAllister notified Innovation that she scheduled her neuropsychological evaluation with another doctor, Dr. Paul Roberts. Considering this upcoming evaluation, Innovation granted her request for additional leave, set to expire at the time of her follow-up appointment with Dr. Kachmann on November 14. By the time of that appointment, however, Dr. Roberts had not completed McAllister's testing. Dr. Kachmann's office sent another work status report to Innovation, this time estimating that McAllister could not return to work until February 2017 to allow Dr. Roberts to finish his testing. McAllister again spoke with the human resources department, but Innovation declined to extend her leave any further and instead terminated her on December 14, 2016.

After her termination, McAllister continued her treatment and applied for long-term disability benefits and Social Security Disability Insurance (SSDI) benefits. After completing her

testing, Dr. Roberts opined that "most all of her mental functions were within the normal range or almost above normal range." He believed that McAllister could gradually return to work, and by June 2017, she would have no restrictions.

She applied for long-term disability benefits with Guardian in February 2017. In her application, she recounted her difficulties with memory, balance, arm and hand tremors, neck and muscle pain, basic household tasks, and numbness in her foot. Guardian granted McAllister long-term disability benefits until it terminated them in October 2018 when it determined she no longer had "functional deficits … that would support an inability to return to work" as a machine operator.

In addition to long-term disability benefits, McAllister applied for SSDI benefits in September 2017. In her application she asserted that "I BECAME UNABLE TO WORK BECAUSE OF MY DISABLING CONDITION ON June 10, 2016. I AM STILL DISABLED." She identified several ailments that afflicted her: brain injury, cervical vertebrae injury, tremors in right arm, head shakes, "can't raise arms above my head," "unsteady on my feet when up and down stairs," and "right foot and leg numbness." She further listed that her injuries adversely affected her ability to: lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, recollect, complete tasks, concentrate, use her hands, and get along with others. The Social Security Administration granted her SSDI benefits in February 2018, to apply retroactively to the date of her accident.

McAllister sued Innovation in November 2017, alleging that Innovation failed to accommodate her under the ADA as well as bringing several causes of action for discrimination. Innovation filed a motion for summary judgment on all of McAllister's claims. McAllister only defended her failure-to-

accommodate ADA claim. The district court granted Innovation's motion in full. With respect to the contested ADA claim, the court found that McAllister was not "qualified" under the ADA. Alternatively, the district court found that McAllister was equitably estopped from arguing she was "qualified" because she received disability benefits premised on contradictory representations about her inability to work. McAllister timely appealed.

## II. Discussion

We review a district court's grant of summary judgment de novo, viewing the record in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor. *James v. Hyatt Regency Chi.*, 707 F.3d 775, 779 (7th Cir. 2013). The moving party, in this case Innovation, is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Thus, to survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

"The ADA requires employers to make reasonable accommodations for a qualified individual with a disability." *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014). McAllister "bears the burden of proving that she is a 'qualified individual with a disability'—that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of her job." *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (quoting 42 U.S.C.

§ 12111(8)). "Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002). If McAllister proves she was a qualified individual, then Innovation "has the burden to establish that the accommodation would have created an undue hardship on its business." *Taylor-Novotny*, 772 F.3d at 493.

McAllister argues on appeal that she can satisfy the preliminary showing that she was able to perform the essential functions of her position with or without accommodation, and therefore she is a qualified individual under the ADA. Specifically, she first contends that between August and September 2016 she could have performed her machine operator job with accommodations. Next, she argues she could have performed rework or an assembly job without accommodations during that same period. Failing that, she then asserts that Innovation should have granted her additional leave, which she argues would have been reasonable.

### A. Machine Operator

First, McAllister argues that had she "received the same accommodations available to employees with work-related injuries, McAllister[] could have returned to work as a machine operator in August and September 2016." McAllister urges that she could have continued working *but for* Innovation's unwillingness to accommodate her lifting restrictions. McAllister's threshold problem is that her contentions that she could work that summer as a machine operator directly contradict her doctors' orders.

"At summary judgment, it is the plaintiff's burden to provide evidence such that a rational jury could find her to be a qualified individual," meaning the plaintiff "is one who 'can perform the essential functions of the employment position' either 'with or without reasonable accommodation.'" *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 628 (7th Cir. 2020) (quoting 42 U.S.C. § 12111(8)). Once an employee is evaluated by a doctor, an "employer is entitled to rely on a physician's recommendation that the employee is not able to safely perform an essential function of his job." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 294 (7th Cir. 2015) (citation and internal quotation marks omitted). Thus, absent evidence to the contrary, a doctor's view that an employee cannot "return to work … in any position" means an employee cannot "establish that she is a 'qualified individual with a disability' under the ADA." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 525 (7th Cir. 1996); *see also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir. 1996).

McAllister's doctors made clear that she could not work as a machine operator during the summer of 2016, even with reasonable accommodation. Dr. Kachmann told Innovation on June 16, 2016, that McAllister was "totally disabled" and that she was unable to perform "any & all" job functions until September 8, 2016. Then, on August 24, 2016, Christlieb, on behalf of Dr. Kachmann, notified Innovation that she did not "feel at this time [McAllister] is quite ready to go back to work," estimating yet another six weeks before she could return. Even though McAllister now argues she was then fit to work, her doctors at that time thought otherwise, reporting serious lingering physical and mental symptoms: central cord syndrome, a closed-head injury, "dizziness and vertigo," and memory and speech difficulties. During the relevant period

between August and September 2016, her doctors never found (nor notified Innovation) that McAllister's condition had improved enough to allow her to return to work; they maintained throughout that she had not improved. It would defy common sense to demand that Innovation disregard these well-documented medical opinions and allow its employees, like McAllister, to prematurely return to work, thereby jeopardizing their safety. Instead, Innovation was "entitled to rely on [these] recommendation[s] that [McAllister was] not able to safely perform an essential function of [her] job." *Stern*, 788 F.3d at 294. Therefore, "[t]he undisputed facts establish that [McAllister was] unable to perform the essential functions of her position," *Weiler*, 101 F.3d at 525, and was thus not a qualified individual under the ADA.

McAllister attempts to sidestep this analysis by pointing to how Innovation treated its employees injured in the workplace because "if an employer has a policy of creating light-duty positions for employees who are occupationally injured, then that same benefit ordinarily must be extended to an employee with a disability who is not occupationally injured unless the company can show undue hardship." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017). This argument misses the mark. Whether other employees received accommodations (reasonable or not), McAllister cannot escape the unfortunate reality that her doctors wholly precluded her from returning to work during the summer of 2016 in the first place.

McAllister then attempts to contradict her doctors' statements and bolster her claim that she could return to work in August and September through the testimony of her sister

and boyfriend. In *Stern v. St. Anthony's Health Center*, we affirmed summary judgment because a plaintiff failed to present "non-speculative, non-conclusory evidence that a proposed accommodation or treatment would have allowed him to adequately perform the essential functions of his job." 788 F.3d at 289. We held that even the statements of the plaintiff's psychiatrist were "too conclusory and uninformative" to satisfy the plaintiff's burden. *See id*. (citing *Weigel v. Target Stores*, 122 F.3d 461, 469 (7th Cir. 1997)).

McAllister cites lay testimony from her sister, Kim Raderstorf, and her former supervisor and boyfriend to show that she could perform the duties of her machine operator job. Based on their knowledge of Innovation's operations, they testified, in McAllister's view, that she could have returned with accommodations. In her affidavit, Raderstorf discussed how she regularly observed McAllister engaging in physical activity during summer 2016, including "regular walks" and "shopping trips," and "mental activity, such as calculating bills and communicating with others." It follows, according to McAllister, that with accommodations akin to those received by others, she could have resumed working.

Raderstorf's lay testimony does not contradict the doctors' testimony to create a genuine dispute about whether McAllister could return as a machine operator because it lacks foundation and is conflicting. "[W]here deposition testimony and an affidavit conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken." *See Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018) (citation and internal quotation marks omitted). Raderstorf made comments in her deposition that she had a "lack

of knowledge" to state, as she did in her affidavit, that McAllister could have "returned months prior to December[] 2016," admitting she "shouldn't have put that in there." *See Stern*, 788 F.3d at 287 (reasoning plaintiff's administrative assistant lacked knowledge of his duties to sufficiently "rebut[] [the doctor's] professional opinion that [plaintiff] was 'not believed to be fit for duty'"). Raderstorf also admitted that McAllister did not return to shopping until spring 2017 and that their walks only began a month after McAllister's rehabilitation. Raderstorf's deposition statements here undercut her affidavit statements—and McAllister's characterization of them. In light of the lack of foundation for and inconsistencies between Raderstorf's deposition and her affidavit statements, her testimony is insufficient to create a material issue of fact to "rebut [Dr. Kachmann and Christlieb]'s professional opinion that" McAllister was unable to work. *Stern*, 788 F.3d at 287.

To the extent the statements of McAllister's boyfriend are not similarly tainted by contradictions elsewhere, those statements alone are far too "conclusory and uninformative" to present a genuine issue of material fact. *Id.* at 289. In *Stern* we rejected even *medical* opinions that were too speculative. *Id.* Here, the boyfriend's "conclusory and untested opinion/hope that the proposed treatment/accommodation would enable [McAllister] to perform the essential functions of [her] job[]," viewed in contrast to the opinions of the medical professionals specifically charged with determining her physical and mental capacities, are insufficient. *See id.* at 288 ("[Plaintiff] fails to lay an adequate foundation establishing that [plaintiff's wife]—who describes her educational degrees as being 'in painting'—is competent to rebut [the plaintiff's doctor's]

professional opinion."). We cannot accept McAllister's boy-friend's post hoc opinions alone to take precedence over those learned views.

McAllister has failed to create a genuine issue of material fact to survive summary judgment that she could "perform the essential functions" of her machine operator job during August and September 2016, even with accommodations. *See* 42 U.S.C. § 12111(8). Given this failure to demonstrate a capability to perform the essential functions asked of a machine operator, McAllister is not a qualified individual under the ADA.

## B. Other Jobs

Second, McAllister argues that beyond her view that she could have worked as a machine operator with accommodations she could also have worked in other capacities. In particular, she argues she "could have performed the light-duty job of rework in August and September of 2016" and she could have "filled a vacant assembly position." The same threshold problem described above remains: her doctors precluded her from working in any capacity, even a desk job. Thus, the post hoc assertions that she could have performed in these roles ring hollow. She again places too much reliance on lay testimony, this time from her other sister who believed McAllister could have performed the assembly worker job during the summer.

To downplay the effect of her doctors' orders, McAllister argues that had Innovation offered to accommodate her, her doctors would have cleared her to work. This argument relies on the faulty assumption that her doctors would have allowed her to return to work under any circumstances. The

statements of her doctors made clear that not only could McAllister not work as machine operator, but she could also not work at all. Dr. Kachmann notified Innovation that McAllister could not perform "any & all" functions and, when deposed, suggested she could not even perform an office or desk job. So even if Innovation bent over backwards to accommodate her, there were no accommodations—short of paying her to not work—that could have mitigated McAllister's sweeping limitations. In this vein, McAllister suggests that because her doctors never knew what her job entailed they never had the opportunity to adequately assess her ability to work. Even if true, the fact that her doctors (without knowing any details of her job) ordered her not to return to work could just as easily imply that the severity of her injuries meant she could not work in any capacity.

McAllister then turns around to argue the contrary: not only did her doctors know of the details of her job but their orders that she not work were rooted in those very details and Innovation's alleged unwillingness to accommodate her. But support on the record for this claim is wanting. McAllister alleges that Christlieb instructed her not to return to work only "after assessing [her] medical condition and unaccommodated job requirements, including lifting restrictions." Yet Christlieb testified that she only had a "brief" discussion with McAllister about her job and had no recollection of her duties. This testimony alone is too weak to support McAllister's view that her doctors ordered that she stay home *because* Innovation refused to accommodate her. McCallister accordingly failed to create a genuine dispute of material fact that she could perform another job with or without accommodations; the record establishes the opposite is true, that she could not

work in any role at Innovation. Thus, the district court did not err in granting summary judgement.

## C.  Extended Medical Leave

Third, attacking from a slightly different angle, McAllister argues that even if no other accommodations were available, Innovation could have granted her additional leave, which would have been reasonable. In particular, she argues that if Innovation permitted her to return to work during some period in August or September 2016 (which, again, Innovation could not because of her doctors' orders), then McAllister would not have needed the monthslong leave that she requested and would only have only requested "a few weeks."

As already stated, to be "qualified" under the ADA, an individual must be able to "perform the essential functions" of her job "with or without reasonable accommodation." 42 U.S.C. § 12111(8). "Inability to work for a multi-month period removes a person from the class protected by the ADA." *Byrne v. Avon Prod., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003). By October 2016, however, Innovation already knew that McAllister had been unable to "perform the essential functions" of her job for months and would not be cleared to work for several more months still.

In *Severson v. Heartland Woodcraft, Inc.*, we expanded on *Byrne*, holding that a "multimonth leave of absence is beyond the scope of a reasonable accommodation under the ADA." 872 F.3d at 479. We said:

> [A] long-term leave of absence cannot be a reasonable accommodation. As we noted in *Byrne*, "[n]ot working is not a means to perform the

> job's essential functions." Simply put, an ex-
> tended leave of absence does not give a disabled
> individual the means to work; it excuses his not
> working. Accordingly, we held in *Byrne* that
> "[a]n inability to do the job's essential tasks
> means that one is not 'qualified'; it does not
> mean that the employer must excuse the inabil-
> ity."

*Id.* at 481 (citations omitted).[2]

McAllister instead attempts to analogize her situation to *Haschmann v. Time Warner Entertainment Co.*, 151 F.3d 591 (7th Cir. 1998), which concerned a plaintiff's request for additional leave of two to four weeks after already receiving two weeks of leave and two weeks of a reduced schedule, *id.* at 595. We held "there was sufficient evidence from which a reasonable juror could conclude that the second medical leave, as re-quested, would have been a reasonable accommodation." *Id.* at 601.

Even assuming McAllister worked in August and Septem-ber 2016, Innovation would have needed to grant McAllister leave from October 2016 until February 2017 (when her doc-tors expected to clear her), for a total of four months. McAl-lister's claim that she would have "only requested a few weeks leave in October" is thus unsupported by the record.

---

[2] Of course, we do not eliminate "the possibility that a brief period of leave to deal with a medical condition could be a reasonable accommodation in some circumstances." *Severson*, 872 F.3d at 481. Such an accommodation is particularly apt for "intermittent conditions," *Byrne*, 328 F.3d at 381, dis-tinguishable from the more sustained condition from which McAllister suffered.

The four months of leave she would have required would have been on top of the two and a half months of leave Innovation gave her between June and August 2016. Far from a modest two to four weeks of leave, *see Haschmann*, 151 F.3d at 595, four months (or six and a half months if we include the initial two and a half months) is plainly not a reasonable accommodation, *see Severson*, 872 F.3d at 479. Affording McAllister such prolonged leave effectively excuses her inability to work, which the ADA does not require of employers. *See id.*

McAllister anchors her argument about the reasonableness of requesting additional leave to her related argument that Innovation "obstruct[ed] or delay[e]d the interactive process" in bad faith. *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). In her view, Innovation's alleged refusal to engage in an interactive process prevented her from "finding and requesting a reasonable accommodation." She repeats that "[t]here were reasonable accommodations available to McAllister in August and September 2016."

McAllister's contention that Innovation refused to engage in the interactive process fails because Innovation could not have engaged in an interactive process when her doctors had already barred her from working, finding she could not perform "any & all" functions. "[F]ailure to engage in the interactive process alone is not an independent basis for liability," although "it is actionable if it prevents identification of an appropriate accommodation for a qualified individual." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014) (citation and internal quotation marks omitted). As already discussed, McAllister never clearly asked for an "appropriate accommodation." *See id.* She now argues that "the doctors would have reached a different conclusion" had Innovation

engaged in the interactive process. Beyond cherry-picked statements from Dr. Kachmann about how his opinion depended on what she did for Innovation, there is no evidence her doctors premised their opinions on such details. In fact, Dr. Kachmann elsewhere implied she could not even perform at a desk job, let alone a machine operator job.

McAllister suggests Christlieb's testimony forgetting or not knowing the details of McAllister's job "further pro[ves] that Innovation's conduct influenced and obstructed the conversation." The logical leap makes little sense. Although we must "draw[] all reasonable inferences in [McAllister's] favor," *James*, 707 F.3d at 779, McAllister must still "present affirmative evidence in order to defeat a properly supported motion for summary judgment," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). This gap in the record does not qualify as affirmative evidence of what McAllister discussed with Christlieb nor can McAllister rely on that gap to meet her burden of presenting a genuine issue that she was denied a reasonable accommodation that would have allowed her to resume working. *See id.* at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Because she was not "qualified" to do her job due to her doctors' orders, "this case falls into the category of cases in which an employer's alleged failure to adequately engage in the interactive process is immaterial." *Stern*, 788 F.3d at 293; *see also Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013) ("Even if an employer fails to engage in the required process, that failure need not be considered if the employee fails to present evidence sufficient to reach the jury on the

question of whether she was able to perform the essential functions of her job with an accommodation.").

Accordingly, the district court correctly found that any request for additional leave was not "reasonable," and therefore, McAllister did not establish a genuine issue that she was a qualified individual under the ADA. Having decided McAllister does not qualify as a disabled individual under the ADA, we decline to reach the district court's conclusions about equitable estoppel.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.