In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 20-1912

KEVIN PACK,

*Plaintiff-Appellant,*

*v.*

MIDDLEBURY COMMUNITY SCHOOLS,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:18-CV-00924 — **Damon R. Leichty**, *Judge.*

———————————

ARGUED JANUARY 21, 2021 — DECIDED MARCH 10, 2021

———————————

Before SYKES, *Chief Judge*, and MANION and ST. EVE, *Circuit Judges*.

MANION, *Circuit Judge*. Kevin Pack brought employment claims against Middlebury Community Schools ("School," "MCS"). The parties resolved that case by executing a settlement agreement with confidentiality and non-disparagement provisions. Pack now claims the School breached that contract by (1) maintaining a prior press release critical of Pack on its website, (2) submitting an affida-

vit critical of Pack in separate litigation, and (3) making statements to prospective employers beyond the contract's bounds.

The district judge granted summary judgment to the School because it (1) had no contractual obligation to remove the pre-existing press release from its website, (2) enjoys absolute privilege for the affidavit submitted in separate litigation, and (3) did not disclose contractually forbidden information to "prospective employers" because the callers were not "prospective employers." We affirm.

## I. Background

### A. Employment dispute

In August 2013, the School hired Pack to teach high-school German. The School terminated his employment less than a year later, in April 2014. Soon after the termination, the School published a press release about Pack on its website. Given the procedural posture, we accept Pack's characterization of the press release as a statement by the School criticizing Pack, which remains publicly available on the School's website.

In January 2015, Pack sued the School. He claimed it fired him because he was an atheist. *The Elkhart Truth* ran an article later that month under the headline: "Fired Northridge teacher, an atheist, sues Middlebury Community Schools for religious discrimination."

### B. Settlement agreement

On November 14, 2016, Pack and the School (aka "MCS") settled that case and entered into a settlement agreement containing various clauses pertinent to the matter before us.

Pack agreed to release all claims against the School accruing before November 14, 2016. (Settlement Agreement, ¶ 3, reproduced in our Appendix.) The School agreed to maintain a level of confidentiality, and agreed to tell Pack's prospective employers only limited information about him:

> **6.     Confidentiality.** The Parties agree to the following with respect to confidentiality:
>
> …
>
> **B.     MCS commitment.** MCS will not disclose or discuss the dispute or the settlement. MCS agrees that it will not make any public representations concerning Plaintiff and in the event that it receives any inquiries from **prospective employers** of Plaintiff, the agents and/or employees of MCS will provide only Plaintiff's positions held and dates of employment, without other information or comment. MCS agrees that in response to the inquiries regarding the Plaintiff's claim or the litigation MCS will state only that "the case has been settled under confidential terms" and nothing more shall be said by MCS about this matter.

(Settlement Agreement, ¶ 6.B., emphasis added.)

The School agreed it would not disparage Pack:

> **C.     Non-disparagement.     The parties further agree that neither they nor their representatives will disparage the other party. Disparage** as used herein shall mean any communication, verbal or written, of false or defamatory information or the communication

of information with reckless disregard to its truth or falsity. The employer agrees that it **shall not make any statements**, either internally or externally, that reflect adversely on Mr. Pack's job performance … . Each party **shall refrain from all conduct**, verbal or otherwise, which would damage or impair in any way the others' reputation, goodwill, services, or standing in the community through any medium whether written, tangible, electronic, computerized, verbal, or any other form including the internet, e-mail, or other modalities.

(*Id.*, ¶ 6.C., emphasis added.) The settlement agreement does not mention the April 2014 press release.

### C. Affidavit

In January 2017, Pack sued *The Elkhart Truth* in Indiana state court, alleging that the January 2015 article defamed him. The School Superintendent, Jane Allen, gave an affidavit supporting *The Elkhart Truth*'s motion to dismiss. We accept as true that Allen submitted the affidavit voluntarily, that it criticizes Pack, and that it included the press release as an exhibit.

### D. "Prospective employers"

In June 2018, Pack recruited two acquaintances to call the School and pose as his prospective employers. During one call, Allen said Pack was "terminated" and that the termination was "a matter of public record." During another, Allen said Pack was "terminated" and that the termination was "for cause."

**E. Breach-of-contract suit**

In November 2018, Pack sued the School for breach of the settlement agreement (not for defamation). This is the case now before us, under diversity jurisdiction. His complaint framed claims in vague and broad terms. He alleged Allen "violated [the] non-disparagement and non-disclosure clauses by actions detrimental to Plaintiff and intended to disparage and hold him up to scorn … including oral communications and writings intended to damage and disparage." He claimed the School "published and maintained public access to certain material which likewise disparaged [him] and held him up to scorn in its media and communications … ."

The School moved for summary judgment. The district judge analyzed Pack's claims as stemming from three events, which we rearrange chronologically: 1) the School left the 2014 press release on its website after executing the settlement agreement in 2016; 2) Allen submitted an affidavit in Pack's suit against *The Elkhart Truth*; and 3) Allen told Pack's recruited callers that Pack was terminated, which was more than paragraph 6.B. of the settlement agreement allowed the School to say to Pack's prospective employers. (In his opening appellate brief, Pack does not seem to question this characterization of his claims or add any instances of alleged breaches.) The judge granted summary judgment for the School on all claims. Pack appeals.

**II. Discussion**

We review a district judge's grant of summary judgment *de novo*, view the facts in the light most favorable to the non-

moving party, and draw all reasonable inferences in his favor. *McAllister v. Innovation Ventures*, 983 F.3d 963, 967 (7th Cir. 2020). The moving party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

There is no dispute that Indiana substantive law applies. A settlement agreement is a contract. When a contract's language is clear and unambiguous, that plain language controls. Courts will not rewrite clear contracts. *See Hartman v. BigInch Fabricators & Constr. Holding Co.*, 161 N.E.3d 1218, 1220–22 (Ind. 2021) ("Indiana courts firmly defend parties' freedom to contract by enforcing their chosen terms. So, when construing an agreement, we focus on the words that the parties agreed to, giving clear and unambiguous language its ordinary meaning. … [A] court will not rewrite an explicit agreement.") (internal quotation marks and citations omitted).

Here, there are no genuine issues of material fact, and the School is entitled to judgment as a matter of law.

### A. Press release

### 1. first half of non-disparagement paragraph: "communication" and "statements"

The settlement agreement contains a forward-looking non-disparagement paragraph. In the first half of that paragraph, both parties agreed "that neither they nor their representatives *will* disparage the other party." (Settlement Agreement, ¶ 6.C., emphasis added.) The agreement defines "disparage" as "any communication, verbal or written, of false or defamatory information or the communication of in-

formation with reckless disregard to its truth or falsity." (*Id.*) And (regardless of truth) the School promised "that it **shall** not make any statements … that reflect adversely on Mr. Pack's job performance … ." (*Id.*, emphasis added.)

The simple facts are that the School issued the press release and put it online before executing the settlement agreement, which contains only prospective, forward-looking obligations regarding non-disparagement.[1] So the agreement does not apply to the pre-existing press release.

During settlement negotiations, Pack could have sought to include in the agreement an obligation that the School rescind the press release, remove it from its website, redact it, or protect it with a password. But Pack apparently did not seek any of this. Or if he did, the School did not agree. Indeed, the agreement releases prior claims, which include prior claims pertaining to the pre-existing press release.

Pack concedes that the agreement casts obligations in prospective terms. But Pack argues that each time anyone accesses the press release on the internet after the date of the agreement, the School breaches the agreement anew. The public can access the press release anytime without any password or any special request.

The Indiana Supreme Court is apparently silent on the issue of whether a statement on a website speaks anew each time someone accesses it, such that a prospective-looking contract applies even though the statement's April 2014 crea-

---

[1] Pack concedes that (1) the School posted the press release online before executing the settlement agreement, (2) the agreement's non-disparagement terms are prospective (not retrospective), and (3) the agreement releases anything that occurred before its execution.

tion preceded the contract. Neither party offers any controlling Indiana caselaw on point. So we must predict how the Indiana Supreme Court would rule. *MindGames, Inc. v. Western Pub. Co.*, 218 F.3d 652, 655–56 (7th Cir. 2000).[2]

Courts have consistently rejected arguments similar to Pack's. For example, in *Platinum Luxury Auctions v. Concierge Auctions*, 227 So.3d 685 (Fla. Dist. Ct. App. 2017)—a case discussed by the district judge—Florida's appellate court reversed the trial court for following an argument that is materially indistinguishable from Pack's. There, the bidding between two auction companies ran on with escalating rivalry. Platinum[3] posted negative comments about Concierge on January 27, 2014, in the comments section of a January 22, 2014, online magazine article. Nearly nine months later, in September 2014, Concierge and Platinum executed a settlement agreement. The agreement explicitly required Platinum to publish a retraction of the January 27 post. The agreement also included a non-disparagement paragraph by which Platinum recognized that the reputation of Concierge was "important and should not be impaired by Defendants **after** this Agreement is executed," and by which Platinum agreed,

---

[2] One hint might come from Indiana's position on the single-publication rule, a related doctrine. But the Indiana Supreme Court apparently has no reported decisions accepting or rejecting this rule, at least not in the context of the internet. *See* Itai Maytal, *Libel Lessons from Across the Pond: What British Courts Can Learn from the United States' Chilling Experience with the "Multiple Publication Rule" in Traditional Media and the Internet*, 3 J. Int'l Media & Ent. L. 121, 143 n.54 (2010) ("Indiana … [has] not decided whether to follow the single publication rule, but [its] federal district courts have applied [it].").

[3] We group the appellants there under one name for easy handling.

in forward-looking language, not to disparage Concierge. *Platinum*, 227 So.3d at 686 (quoting settlement agreement and adding emphasis).

Soon after the agreement, Platinum published a retraction of the January 27, 2014, post. But that did not satisfy Concierge. It complained that a January 2014 online article[4] criticizing and disparaging Concierge was accessible on websites controlled by Platinum. Concierge argued this January 2014 online article violated the non-disparagement provision and asked the trial court to order Platinum to remove the article from Platinum's websites. The trial court agreed, finding that the January 2014 online article disparaged Concierge and that Platinum's refusal to remove it violated the non-disparagement provision.

But the Florida appellate court reversed. It determined that the clear terms of the non-disparagement provision applied to statements made after the agreement was executed on September 5, 2014, so the provision did not apply to the January 2014 online article. Concierge knew about the January 2014 online article when it executed the agreement. So if Concierge had wanted Platinum to remove the January 2014 online article from its websites, Concierge could have negotiated for that. Instead, the agreement only mandated retracting the January 27 comment post and only forbade Platinum from disparaging Concierge in the future. So the trial court inappropriately rewrote the contract when it ordered removal of the January 2014 online article.

---

[4] Apparently this article was different from the January 22, 2014, online magazine article to which Platinum posted the comment on January 27, 2014.

Here, Pack seeks similar relief in a similar situation. His attempts on appeal to distinguish *Platinum* fail.

First, Pack makes a cryptic argument about "mandatory joinder." He says the *Platinum* court "ruled that failure of the Plaintiff there to include an objection to the older posting limited its remedies in the suit filed as a 'mandatory joinder' case where Plaintiff had his shot." We are not sure what Pack means. Surely he does not mean that the Florida appellate court based its decision to reverse on a failure by Concierge to object *in litigation* to the older post, or based its decision on a statute or rule requiring mandatory joinder of certain claims. *Platinum* contains no language to that effect. Maybe Pack means the Florida appellate court based its decision on the fact that the settlement agreement did not include an explicit requirement that Platinum remove the older post. But that was only part of the *Platinum* court's reasoning. Concierge's main problem was that the agreement's non-disparagement provision spoke in forward-looking terms. It was merely an additional problem that the agreement did not carve out an exception to the forward-looking terms by explicitly requiring removal of the older post, like it did for the newer post. In other words, Pack tries to narrow *Platinum* unfairly.

Second, Pack argues that in *Platinum* the settlement agreement's language limited the scope of covered disparagement to "written or verbal" statements and did not reference the internet, whereas Pack's settlement agreement is broader because it references "conduct" and not just "statements" and because it references "the internet." But Pack's suggestion that the agreement in *Platinum* did not apply to conduct or to the internet is wrong. Pack offers no explana-

tion for why the *Platinum* agreement's broad statement that "the professional, business and personal reputations of Plaintiff and its employees, directors, and officers are important and should not be impaired by Defendants after this Agreement is executed" does not include conduct or the internet. And Pack offers no reason why the phrase "any statements, written or verbal" in the provision that "Defendants agree not to make any statements, written or verbal … that defame, disparage or in any way criticize …" does not include the internet. Pack advances no reason to think "written" requires paper. Besides, Pack's characterization of the reasoning—that the contract failed to mention the internet specifically, so the contract does not cover the online statement—played no part in *Platinum*'s logic or conclusion. So Pack fails to distinguish *Platinum*.

The vast majority of published opinions on point seem to accord with *Platinum*. *Platinum* had no need to discuss the single-publication rule by name because that decision (like ours) dealt with a breach-of-contract claim, and not a defamation claim. The majority approach to a defamation case involving a single statement posted online is to apply the single-publication rule. *See Kiebala v. Boris*, 928 F.3d 680, 686 (7th Cir. 2019) (We predicted Illinois would apply the single-publication rule to the internet and hold that "updating" a previously published internet post, without changing its content, does not newly circulate or republish the post for statute-of-limitations purposes.); *Pippen v. NBCUniversal Media*, 734 F.3d 610, 615–16 (7th Cir. 2013) (Collecting cases, we predicted Illinois would apply the single-publication rule to the internet and deem the "passive maintenance" of a website not a republication of that website's content.); *Yeager v. Bowlin*, 693 F.3d 1076, 1082 (9th Cir. 2012) (Under California

law, "a statement on a website is not republished unless the statement itself is substantively altered or added to, or the website is directed to a new audience."); *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1169 (9th Cir. 2011) (continuing to host a press release online is "inaction" which "is not a republication"); *Nationwide Bi-Weekly Admin. v. Belo Corp.*, 512 F.3d 137, 146 (5th Cir. 2007) ("Based on the near unanimity of the large number of courts to apply the single publication rule to Internet publications, the fact that the only case to hold otherwise (*Swafford*) is distinguishable, and because sound policy reasons support its application in this context, we hold that the Texas Supreme Court would likely adopt the single publication rule for Internet publications."); *Van Buskirk v. The New York Times Co.*, 325 F.3d 87, 89 (2d Cir. 2003) (recognizing New York applies the single-publication rule to the internet).

Pack only mentions one case to avoid the implications of *Platinum* and the single-publication rule: *Swafford v. Memphis Individual Practice Association*, No. 02A01-9612-CV-00311, 1998 WL 281935 (Tenn. Ct. App. June 2, 1998).[5] But *Swafford* does not help Pack.

*Swafford* recognized that Tennessee adopted the single-publication rule in 1973. But *Swafford* held the rule did not apply to a particular set of facts: Defendants reported Dr.

---

[5] At least, we think this is the case Pack referenced. His table of authorities lists a case with this name, and his brief discusses a case with the name and substance of the case we cite. But nowhere in his brief does Pack properly cite *Swafford*. And this is not the only example of similar problems in Pack's brief. Also, we note *Swafford* is an unpublished decision from Tennessee.

Swafford's termination to the National Practitioner Data Bank, which kept information confidential from the public and only allowed access to certified health care entities. Each transmission by the Data Bank of the report "was released in response to an affirmative request by a … health care entity." *Swafford*, 1998 WL 281935 at *5. The health care entities "requested information from the Data Bank on separate and distinct occasions." *Id.* at *8. *Swafford* specifically said it was not addressing a situation like Pack's: "We do not address a situation in which the information in the Data Bank could be accessed by the general public." *Id.* at *8, n.8.

If anything, *Swafford*'s logic tends to support the School. *Swafford* recognized the single-publication rule can be applied to the internet. *Swafford* understood the justification for the single-publication rule (an exception to the traditional common law's multiple-publication rule) to be avoiding "a vast multiplicity of lawsuits resulting from a mass publication." *Id.* at *8. *Swafford* concluded that this justification was absent when access to information online was restricted. But in our case, the press release is available online to the general public, with no special requests required, so the justification for the single-publication rule applies.

We conclude that the Indiana Supreme Court would conclude that the press release is not a new statement each time someone accesses it on the School's website, and that the first half of the settlement agreement's forward-looking non-disparagement paragraph does not compel the School to retract, take down, redact, block, or password-protect the pre-existing press release on its website.[6] Merely maintaining its

---

[6] Pack seems to narrow his request in his appellate reply: "There is no issue in this case of whether or not the Defendant school corporation

website with the pre-existing press release did not breach the first half of the non-disparagement paragraph.

**2. second half of non-disparagement paragraph: "conduct"**

The second half of the non-disparagement paragraph might have presented a closer question. There, the School promised it "shall refrain from all *conduct*, verbal or otherwise, which would damage or impair in any way [Pack's] reputation … through any medium … including the internet … ." (Settlement Agreement, ¶ 6.C., emphasis added.) Parties are generally free to contract. Parties are free to agree to more protections than tort law affords. Parties are free to contract around the single-publication rule's implications. Just as Pack could release claims based on the April 2014 creation of the pre-existing press release, so also the School could agree to restrict its future non-verbal conduct. So the question might have been: does the agreement cover the press release because the School is engaging in forbidden "conduct" after the agreement by the act of maintaining its website with the press release on it, regardless of whether the press release speaks anew each time someone accesses it? But Pack failed to develop this argument on appeal, failed to make factual allegations or advance evidence to support it, and abandoned it entirely in his reply. So we find no error. We make no prediction about what the Indiana Supreme Court would do with a well-developed and supported "conduct" clause argument, distinct from a republication argument.

should 'retract' the published press release article, but it certainly should 'redact' it or limit it to 'password protected.'"

## B. Affidavit

Superintendent Allen submitted an affidavit for *The Elkhart Truth*'s motion to dismiss Pack's defamation suit against it. She did this after execution of the settlement agreement. For present purposes we accept as true Pack's claims that Allen submitted the affidavit voluntarily, under no subpoena; that the affidavit disparaged Pack and attached the press release as an exhibit; and that it did not comport with some of the plain terms in the agreement.

Pack claims the School breached the agreement when Allen submitted this affidavit. But the School asserts the absolute litigation privilege. The district judge noted that Pack did not address the privilege, and that "[h]is waiver reads as a wise concession."[7]

But Pack raised the affidavit issue in his appeal and challenged the School's assertion of the privilege, and in response the School failed to argue he waived the challenge to the privilege or conceded the privilege applied. So the School (arguably at least) waived the waiver. *See McKnight v. Dean*, 270 F.3d 513, 518 (7th Cir. 2001) (recognizing "waiver of waiver" as an established doctrine).

---

[7] At oral arguments, Pack insisted he did not waive an argument against the privilege by failing to respond on point before the district court. It is true that Pack's brief below opposing summary judgment argued that Allen submitted her affidavit voluntarily. But in that brief, Pack did not make any argument about why the voluntary nature of the affidavit eliminated the privilege. And Pack only mentioned "privilege" once there, claiming the School had waived any claim to immunity or privilege. And Pack did not mention *Perkins* there.

Regardless of waiver, the district judge went on to analyze the merits of whether the privilege applies. And regardless of waiver, we conclude the district judge did not err in concluding it does.

Pack's main argument against the privilege seems to be that Allen submitted her affidavit voluntarily, without a subpoena or other compulsion. But the affidavit's voluntary nature is irrelevant to whether the privilege attaches.

By 1895, the Indiana Supreme Court intimated that it was already "well settled by many authorities" that a statement made for "a proceeding in due course of law" was privileged. *Wilkins v. Hyde*, 41 N.E. 536, 536 (Ind. 1895). The court did not identify any exception for volition. Even the statement's truth or effectiveness were not relevant for the privilege: "As to whether the charge be true or false, or whether it be sufficient or not to effect the object in view, if it be made in the due course of a judicial or legal proceeding, it is privileged, and cannot be made the basis of an action for defamation of character." *Id.* The justification the court gave for the privilege during the second presidency of Grover Cleveland remains sound—and obvious—today: "The reason upon which the rule is founded is the necessity of preserving the due administration of justice." *Id.*

Citing *Wilkins* as recently as 2008, the Indiana Supreme Court confirmed that "Indiana law has long recognized an absolute privilege that protects all relevant statements made in the course of a judicial proceeding, regardless of the truth or motive behind the statements." *Hartman v. Keri*, 883 N.E.2d 774, 777 (Ind. 2008).

So whether Allen was motivated by a subpoena or not, her affidavit is privileged. *See Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 378 (7th Cir. 2010) (predicting Indiana would apply the privilege to voluntary statements in a RICO complaint, despite non-disparagement provision in contract); *Van Eaton v. Fink*, 697 N.E.2d 490, 494 (Ind. Ct. App. 1998) ("Absolute privilege provides judges, attorneys, parties and witnesses, in connection with a judicial proceeding, immunity from liability even if they publish defamatory material with an improper motive.") Nothing in Indiana law limits the privilege to compulsory testimony. The failures of Pack's attempts to distinguish *Hartman*, *Wilkins*, and other cases are too bizarre to merit further discussion.

Pack's reliance on *Perkins v. Memorial Hospital of South Bend*, 141 N.E.3d 1231 (Ind. 2020)[8] is also strange. *Perkins* was not about a privilege from tort or contract claims based on statements made during litigation. Rather, it was about Indiana's "public policy" exception to the doctrine of at-will employment which protects from termination an employee exercising a clear statutory right or obeying a legal duty. *Perkins*, 141 N.E.3d at 1235. The School points this out in its appellate response brief. In his reply Pack does not mention *Perkins*, much less defend his reliance on it.

The touchstone for the privilege is pertinence: "For immunity from liability to exist based on absolute privilege, the statement in question must be relevant and pertinent to the

---

[8] At least, we think Pack relies on this case, even though his citation to it references the Indiana Court of Appeals in 2019 and not the Indiana Supreme Court in 2020, despite referencing the reporter containing the Indiana Supreme Court's decision.

litigation or bear some relation thereto." *Eckerle v. Katz & Korin, P.C.*, 81 N.E.3d 272, 280 (Ind. Ct. App. 2017) (internal quotation marks omitted). This is a broad, liberal standard. Pack does not offer any reasons to think Allen's affidavit was not relevant or pertinent to the litigation involving *The Elkhart Truth*. We reviewed the affidavit and conclude it pertains to that litigation.

Pack also argues that the privilege only adheres to individual people, and not to corporations. He does not seem to have made this argument below. He cites no authority for it on appeal. Multiple cases belie it. *See Rain*, 626 F.3d at 376–79; *Chrysler Motors Corp. v. Graham*, 631 N.E.2d 7, 10–11 (Ind. Ct. App. 1994).

The district judge did not err in concluding that the privilege applied.

### C. Hoax to coax

Pack recruited two acquaintances to call the School pretending to be prospective employers to see what the School would say about him. In the School's phrasing, the goal of this hoax was to coax the School into violating the settlement agreement.

Allen told these callers that Pack was terminated. According to transcripts of the calls, Allen told someone posing as "Greg Tailcott" that the school board "terminated" Pack and that the termination "is a matter of public record … ." And Allen told "Will Lavner" that Pack was terminated for cause.

Pack is not always clear about which provisions of the agreement, if any, he claims these statements violated. The judge wrote that Pack argued the School violated only paragraph 6.B. during these calls. The judge then quoted only

one provision of that paragraph: "'MCS agrees that … in the event that it receives any inquiries from prospective employers of [Mr. Pack] … MCS will provide only [Mr. Pack's] positions held and dates of employment, without other information or comment.'" (MCS is the School.)

On appeal, Pack does not expand that construction of his claim. To the contrary, he narrows it to oblivion. He argues in his appellate brief that the statements made by the School during the "test" calls "would have been actionable if made to a real potential employer." So Pack admits the recruited callers were not actual "prospective employers." And Pack admits the School's statements are not actionable.

Pack then argues the test "produced evidence of the School's willingness and intent to violate the non-disparagement provision." Even if true, that would not help Pack. He has no claim against the School for "willingness and intent" to commit a violation. And the School is entitled to summary judgment on his press-release claim and affidavit claim for reasons independent of the School's willingness or intent.

Pack then argues the School might have said similar things to actual prospective employers and further discovery might produce a caller "who was, or is, or will be a potential employer." Pack acknowledges that the School denies receiving any calls from prospective employers, but Pack encourages us not to believe the School because of its "demonstrated mendacity and lack of credibility," according to him. Pack has offered no evidence that any actual prospective employers called the School about him, much less any evidence about any contents of those communications. As we often warn, summary judgment is the put-up-or-shut-up moment

in a lawsuit. Pack had the chance to discover any calls from actual prospective employers. He found none. He has offered no reason to think "further discovery" will turn up actionable calls. Pack failed to put up.

Pack then falls back in his appellate brief to an argument that the hoax calls "established that the Defendant was <u>not</u> honoring its obligations set out in paragraph 6(B) of the Settlement Agreement. Under that provision MSC [sic] was to provide only the position of [sic] Plaintiff held, and dates of employment- [sic] without other information or comment." Pack does not make any allegations that the recruited calls involved violations of any provision of the agreement other than paragraph 6.B., and he does not even claim violations of any obligations under paragraph 6.B. other than the particular portion quoted by the judge: the mandate to provide "prospective employers" only Pack's "positions held and dates of employment."

But the "prospective employers" clause does not apply because the callers were not prospective employers. The undisputed evidence is that the recruited callers were not prospective employers of Pack in any sense of that phrase. Pack concedes this. Indeed, in his appellate reply brief he says he has never alleged the School provided information about Pack to his potential employers.

Pack seemed to shift gears during oral arguments. There, he reiterated his argument that the purpose of the sting operation was to show the School's motive and intent. But, for the first time in this appeal, he also seemed to try to claim that the School's statements to his recruited callers violated not merely the "prospective employers" clause but also the

broader non-disparagement clause. But Pack did not make this argument in his appellate briefing. So he lost the chance.

### III. Conclusion

Even accepting the facts in the light most favorable to Pack, and drawing all reasonable inferences in his favor, we agree with the district judge that the School is entitled to judgment as a matter of law. We affirm.

<u>APPENDIX</u>

**Settlement Agreement, paragraph 3, emphasis added:**

**3.      <u>Release, Discharge, and Covenant Not to Sue</u>.** By signing this Agreement, Plaintiff … irrevocably and unconditionally **releases**, forever discharges, and covenants not to sue MCS … **from all charges**, complaints, claims, demands, liabilities, obligations, and actions of any kind or nature whatsoever … **that have accrued or will have accrued as of the date Plaintiff executes this Agreement**, whether or not any such matter or claim was asserted or could have been asserted in the Lawsuit, including, for example, claims for attorneys' fees, interest, expenses, expert fees, and costs incurred in connection with the Employment Lawsuit, claims for minimum wage, overtime, lost wages, compensatory damages, liquidated damages, punitive damages, incidental damages of any kind, and any other compensation, losses, and other damages to Plaintiff or his property resulting from any claimed violation of federal, state, local, or common law. This specifically includes, but is not limited to, a full and complete release and waiver of all claims (a) that were or could have been asserted in the Lawsuit, (b) that in any way arise out of, or relate to, or are connected with the Disputes and Plaintiff's employment with MCS and the ending of that employment, (c) that in any way arise out of, or relate to, or are connected with Plaintiff's relationship or interactions with and/or alleged conduct by MCS or any of its predecessors, employees, agents, or attorneys, (d) arising under any and all federal, state, and local laws, statutes, and regulations … .